(252 P.3d 597)
No. 102,511

LOUISBURG BUILDING & DEVELOPMENT COMPANY, L.L.C., CARSON GROUP, INC., and DAMON A. WILLIAMS, *Appellees/Cross-appellants*, v. TROY ALBRIGHT and KRIS ALBRIGHT, *Appellants/Cross-appellees*.

620

Opinion filed April 8, 2011.

*Mark D. Murphy* and *Jeffrey M. Cook*, of The Murphy Law Firm, L.L.C., of Overland Park, for appellants/cross-appellees.

*Mark V. Bodine*, of Bennett, Bodine & Waters, P.A., of Shawnee, for appellee/cross-appellant Louisburg Building & Development Company, L.L.C.

*Gary A. Schafersman* and *James L. MowBray*, of Wallace, Saunders, Austin, Brown & Enochs, Chtd., of Overland Park, for appellees Carson Group, Inc., and Damon Williams.

Before MALONE, P.J., CAPLINGER and LEBEN, JJ.

LEBEN, J.: Louisburg Building & Development Company, L.L.C. ("Louisburg Building") began building a home for Troy and Kris Albright that had several deficiencies. The district court found Louisburg Building liable to the Albrights based on breach of contract and violations of the Kansas Consumer Protection Act (KCPA). The court found that Louisburg Building failed to construct the Albrights' home in a workmanlike manner and that Louisburg Building committed KCPA violations by failing to keep the Albrights informed about exceeding the budget during construction. As a result of these violations, the district court awarded breach-of-contract damages and civil penalties under the KCPA, although the district court did not agree with the Albrights' damage calculation. The Albrights added two other parties to the lawsuit: Louisburg Building's owner, Damon Williams, and a subcontractor in which Williams had an ownership interest, Carson Group, Inc., d/b/a The Homeowner's Helper ("Carson Group"). The Albrights attempted to hold Williams and Carson Group liable for Louisburg Building's debts on the basis that Williams and Carson Group were the alter egos of Louisburg Building, but the district court disagreed. The Albrights also asserted fraud-in-the-inducement claims against Louisburg Building and Williams, but the district court dismissed those claims.

There are many issues on appeal, so we will provide a brief summary here before discussing each issue in detail. The Albrights

argue six issues, but we find only one (listed third below) of merit: (1) we will not consider the Albrights' argument that Williams should have liability in his personal capacity under the KCPA because that theory of liability was not raised before the district court; (2) the district court was correct in finding that Williams was not the alter ego of Louisburg Building as the Albrights failed to show how Williams used Louisburg Building's corporate entity to perpetrate a fraud; (3) the district court erred in employing a measure of damages that did not properly calculate expectation damages; (4) the district court was correct in finding that Louisburg Building and Williams did not violate the KCPA by using Carson Group as a subcontractor since this use did not rise to the level of unconscionability because there was no deceptive element to the conduct; (5) the district court did not err in refusing to award attorney fees under the KCPA as the Albrights were unsuccessful on the majority of the KCPA claims they asserted; and (6) the district court did not err in dismissing the Albrights' fraud-in-the-inducement claims based on the economic-loss doctrine because the damages sought for this claim were purely economic and related solely to the subject matter of the parties' contract.

Louisburg Building argues two issues on cross-appeal, but neither has merit: (1) The district court did not err in finding that Louisburg Building's failure to notify the Albrights of budget problems was unconscionable as this conduct involved both deception and an imbalance of power between the parties; and (2) the district court did not err in awarding the Albrights both breach-of-contract damages and civil penalties under the KCPA because the KCPA's election-of-remedies provision only requires a choice between civil penalties and damages under the KCPA, not damages awarded generally under other legal claims.

## Factual and Procedural Background

The Albrights purchased land in Louisburg, Kansas, from Damon Williams around 2002. The Albrights wanted to build a new home on the land, and Williams, as operating manager and 50% owner of Louisburg Building, offered to build it for them. Before buying the land, the Albrights put considerable thought into the

home they wanted to build, accumulating pictures and other materials that exemplified the "French Tuscany" style they desired. The Albrights showed these pictures to Williams during the negotiation process, discussing specific details as to the quality of home they wanted, and Williams assured the Albrights that he could deliver.

Williams referred the Albrights to George Holton, an architect whom Williams had worked with several times in the past. Based on the materials provided by the Albrights, Holton designed a set of plans, and based on those plans, Williams prepared a construction bid for roughly $650,000. That price was too high for the Albrights' $550,000 budget, so they directed Holton to reduce the square footage of the plans but not to deviate from the high-quality finish. The Albrights provided the second plans to Williams, reiterating that the finish was to remain high quality, and Williams came back with a proposal to build the house for $545,668. The proposal included the price estimates for various categories of work, but it stated: "If additional work is required over and above the estimated, quoted, bid or proposed work, an EXTRA charge will be assessed."

Louisburg Building began construction on the Albrights' home in November 2003, several months before the execution of a "cost plus fixed fee" construction contract on January 6, 2004. The contract incorporated several attachments, including the plans developed by Holton and a bid sheet with the prices from Williams' proposal with the word "estimates" above the price column. Under the terms of the contract, Louisburg Building would pay for the construction costs by drawing from a construction loan secured by the Albrights, and the contract prohibited the Albrights from personally drawing on the account. The contract required that Louisburg Building "supervise, direct and coordinate the construction of the Residence . . . substantially in accordance with the Plans, in a good and workmanlike manner in accordance with standard residential construction practices in the area." In exchange for these services, Louisburg Building would be paid 15% of the total construction cost, which included any costs incurred directly by the Albrights to pay for items not included in the bid sheet.

The construction's progress experienced several hang-ups. The Albrights quickly grew wary of Louisburg Building's ability to construct the home they desired because of inactive periods and Williams' absence from the construction site. Also, the framing process revealed that Holton's architectural plans had significant defects—access to the second floor was limited to a 2-foot opening, which meant the roofline had to be reconfigured—and these defects gave the Albrights concerns about structural integrity. The Albrights' faith in Williams was further shaken by his use of Carson Group as a subcontractor, a company that Williams wholly owned. Williams used Carson Group for various jobs throughout the construction process without ever disclosing that he owned the subcontractor. Moreover, Carson Group never provided any estimate as to how much its work would cost, engaging in open-ended hourly billing. At trial, the Albrights' expert witness testified that Carson Group had overbilled the Albrights for subpar work.

Roughly 10 months into the building process, after noticing an abnormally high draw request for some deck work, Troy Albright requested a meeting with Williams to discuss budget and quality-of-work concerns. Albright emphasized to Williams that, moving forward, he wanted to know about any costs not specifically called for in the budget. Shortly after this meeting, in September 2004, Williams provided Albright with a budget update that showed certain costs had already exceeded their initial estimate. Albright testified that this was the first time he learned that construction was over budget. Albright then denied Louisburg Building's next two draw requests. Williams provided Albright with another budget update in October 2004; it showed the project to be $69,701.44 over budget. At this point, Albright testified that he thought the project was only 30 to 40% complete.

Because Albright felt that the concerns he raised in the September meeting had not been addressed, Albright's attorney sent a letter to Williams on October 28, 2004, which notified Williams that he was in default of the contract and that he would be given opportunity to cure. Louisburg Building's lawyers sent a letter back to Albright, claiming the Albrights were in default of the contract, and the Albrights then terminated the contract. The Albrights

hired Taylor Aycock to finish the construction on their home, which was not completed until April 2005, at a total cost of $874,426.18.

Louisburg Building brought suit against the Albrights for breach of contract and quantum meruit, which is essentially a demand to be paid a fair amount for services provided. Initially, the Albrights filed counterclaims solely against Louisburg Building for breach of contract, negligence, fraud, and violations of the KCPA. The Albrights later filed a second amended counterclaim, adding claims for fraud in the inducement against Louisburg Building and Williams and claims for KCPA violations against both Williams and Carson Group. Since the statute of limitations was a concern for the amended claims, the Albrights proceeded on the theory that Williams and Carson Group were the alter egos of Louisburg Building. The trial was bifurcated so that the district court could first answer the alter-ego question and then determine the parties' liability. The district court determined that Williams and Carson Group were not the alter egos of Louisburg Building and thus dismissed the Albrights' claims against those two parties. During the liability phase, the district court determined that Louisburg Building breached its contract with the Albrights and committed nine violations of the KCPA. The court awarded the Albrights damages in the amount of $33,306.54 for their breach-of-contract claims and assessed $90,000 in civil penalties against Louisburg Building for violations of the KCPA.

The Albrights appeal the judgment of the district court, and Louisburg Building cross-appeals. More factual and procedural history is set out below as needed to resolve particular issues.

ISSUES RAISED BY APPELLANTS TROY AND KRIS ALBRIGHT

I. *We Do Not Consider Whether Williams Violated the KCPA in His Personal Capacity Because that Theory of Liability Was Not Raised to the District Court.*

On appeal, the Albrights seek to hold Williams personally liable for the KCPA violations on the theory that a member of a limited-liability company is personally liable for any of the company's KCPA violations. But the Albrights concede that they never sought

judgment against Williams on this basis in the district court. There, the Albrights sought liability against Williams under a traditional alter-ego theory: because Williams was the alter ego of the company, its corporate existence should be disregarded and Williams held personally liable for the company's transgressions.

Before trial, Williams and Carson Group filed a motion for summary judgment on the Albrights' KCPA claims, arguing that the statute of limitations barred them. The Albrights clarified that they were not suing Williams and Carson Group in their individual capacities, but only as the alter egos of Louisburg Building. Thus, the Albrights' amended counterclaims adding Williams and Carson Group should relate back to the initial filing of the lawsuit against Louisburg Building. Even if the claims did not relate back, the Albrights argued that their additional KCPA claims were not barred under the 3-year statute of limitations: the conduct that the Albrights alleged constituted Williams and Carson Group's violations did not occur until October 2004, and they filed their second amended counterclaim on April 18, 2007.

The trial court denied Williams' motion for summary judgment on the grounds that if Williams or Carson Group were found to be the same party as Louisburg Building under the alter-ego theory, then the amended KCPA claims would be timely. The court cautioned, however, that the statute of limitations for claims against Williams and Carson started running when the allegedly unconscionable conduct occurred. It implied that there may be a statute-of-limitations problem if the alter-ego theory was unsuccessful. But at this point, the Albrights had not alleged specific dates for the conduct they pled was in violation of the KCPA, so the trial court could not rule specifically as to what the consequences would be if the alter-ego theory failed.

After summary judgment was denied, Williams and Carson made a motion in limine asking the court to prohibit the Albrights from presenting any evidence or claiming any liability on the theory that either party was individually liable under the KCPA. Williams and Carson Group also requested a bifurcated trial, allowing the court to hear the evidence on the alter-ego theory first, so that if either party were found not to be the alter ego of Louisburg Build-

ing, they would not have to participate in the second portion of the trial relating to liability. The trial court granted both motions. As the alter-ego portion of the trial began, the parties and the district court displayed no doubt that the Albrights were not asserting any claims against Williams or Carson Group directly.

As the alter-ego trial progressed, much of the evidence focused on Williams' alleged wrongs during the construction process itself. Williams testified that he was aware that certain changes requested by the Albrights had affected the cost of the house, including architectural changes and changes in the quality of windows. Williams testified that he was aware of the Albrights' $550,000 budget but that he did not provide any written change orders or suggest that the Albrights sign any change orders; he did not recall whether he notified the Albrights of the cost of any materials or if the Albrights ever requested information about cost overruns. Further, Troy Albright testified that the first time he received notice from Williams that the construction was over budget was in September 2004, roughly 10 months into the project.

Both Williams' counsel and the trial court seemed somewhat perplexed by this line of evidence, which did not clearly relate to the alter-ego theory. Williams' counsel objected early on to the relevance of this type of information, and the trial court reiterated twice that evidence of this nature was best left for the second portion of trial, dealing with liability. At the conclusion of the alter-ego trial, the court dismissed with prejudice the Albrights' KCPA claims against Williams and Carson Group because it found that neither was the alter ego of Louisburg Building.

On appeal, the Albrights argue that the trial court erred in dismissing their claims against Williams under the KCPA solely on the finding that Williams was not the alter ego of Louisburg Building. The Albrights argue that their claims against Williams in his personal capacity are not dependent on the alter-ego theory because the KCPA should be interpreted to hold the members of a limited-liability company liable for the company's violations. Presumably, the Albrights are arguing that Williams should be held liable for engaging in unconscionable acts or practices in connection with a consumer transaction under K.S.A. 50-627, as that was

the basis for Louisburg Building's liability in the second phase of trial.

Williams argues that the Albrights did not raise this separate theory of liability at the trial level, so they are prevented from raising it on appeal. Williams notes that the Albrights conceded several times during trial that their only theory of liability against Williams was the alter-ego theory. Further, Williams argues that the alter-ego theory was the only reason that the Albrights' claims against Williams survived summary judgment, as any KCPA claims against Williams were barred by the statute of limitations.

In reply, the Albrights concede that they are raising this theory of liability for the first time on appeal, but they argue the applicability of two exceptions to the general rule against considering new theories on appeal. The Albrights further argue that, despite their failure to assert this theory of liability at trial, Williams will not be prejudiced by this court's decision to find him liable based on facts admitted during the trial of the alter-ego theory. And the Albrights posit that this separate theory of liability would not have been barred by the KCPA's 3-year statute of limitations because 3 years had not yet elapsed since Williams' violations of the KCPA ended by the time the Albrights added personal claims against Williams in their second amended counterclaim.

At the outset, it must be noted that the Albrights, in requesting review of the trial court's "dismissal," have slightly mischaracterized the nature of the question they are calling upon this court to review. The district court only dismissed the claim that Williams should be held liable for Louisburg Building's violations of the KCPA as Louisburg Building's alter ego. The Albrights are now claiming Williams individually violated the KCPA—as the Albrights concede, this claim was never before the district court, and thus the district court could not have dismissed it. Essentially, the Albrights are asking this court to rule on a new theory of liability based upon facts presented in the trial of a completely different theory of liability.

As a general rule, legal theories not asserted at trial will not be considered on appeal. *In re Care & Treatment of Miller*, 289 Kan. 218, 224-25, 210 P.3d 625 (2009). Given the Albrights' consistent

adherence to the alter-ego theory at trial and the parties' mutual understanding that the Albrights were not asserting claims against Williams in his personal capacity, there is no doubt that the Albrights did not raise this theory of liability at trial. But the Albrights are correct that there are several exceptions to this general rule, including where the newly asserted theory raises solely a question of law and is finally determinative of the case, and where consideration of the argument is necessary to serve the ends of justice or prevent the denial of fundamental rights. *Iron Horse Auto, Inc. v. Lititz Mut. Ins.*, 283 Kan. 834, 845, 156 P.3d 1221 (2007). Thus, if we may consider this claim at all, we may do so only if one of those exceptions applies.

We have found no civil case in which one of these exceptions has been applied in the context of an attempt to raise an entirely new theory of liability on appeal. The exceptions are usually considered in the context of a newly raised argument or defense that merely relates to a theory of liability asserted in the court below. *E.g., In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284, *cert. denied* 129 S. Ct. 1320 (2008) (newly asserted defense to plaintiff's motion for hearing by telephone); *Iron Horse Auto*, 283 Kan. at 845 (newly asserted statutory interpretation argument); *Cole v. Mayans*, 276 Kan. 866, 873, 80 P.3d 384 (2003) (newly asserted statutory interpretation argument); *Jarboe v. Board of Sedgwick County Comm'rs*, 262 Kan. 615, 622, 938 P.2d 1293 (1997) (newly asserted defense to negligence claim); *Pierce v. Board of County Commissioners*, 200 Kan. 74, 80-82, 434 P.2d 858 (1967) (recognizing the exceptions and then applying them to the plaintiff's newly asserted theory that defendants took plaintiff's property without due process of law); *Fleetwood Folding Trailers v. Coleman Co.*, 38 Kan. App. 2d 30, 53, 161 P.3d 786 (2007) (newly asserted defense to counterfeit claim). Additionally, it would seem inappropriate to apply either of these exceptions and hold a party liable on appeal under a claim that was never tried in the district court, given every party's "elementary and fundamental right to notice of the pendency of an action and the opportunity to present its objections in any proceeding that is to be accorded finality," as guaranteed by constitutional due-process protections.

*Landmark Nat'l Bank v. Kesler*, 289 Kan. 528, 544, 216 P.3d 158 (2009).

Even if these exceptions may be applied when a completely new theory is asserted for the first time on appeal, neither fits our case. The Albrights argue the question is purely legal and finally determinative of the case. They contend that Williams admitted key factors in the first part of the trial that the trial court relied on to find Louisburg Building liable in the second part of the trial. This argument is incorrect for two reasons. First, the Albrights' claim involves unresolved factual questions relating to the statute of limitations for KCPA violations. The KCPA has a 3-year statute of limitations, which starts running with the occurrence of the alleged conduct constituting the violation, not the discovery of the violations. See *Campbell v. Hubbard*, 41 Kan. App. 2d 1, 7-8, 201 P.3d 702, *rev. denied* 286 Kan. 1176 (2008); K.S.A. 60-512(2). One could argue that the Albrights' new claim is altogether barred by the statute of limitations: the Albrights' appellate brief, which raised this claim for the first time, was not filed until November 24, 2009, more than 3 years after the latest possible KCPA violation that Williams could have committed since Williams left the job site in October 2004.

But an amendment adding new *claims* may relate back to earlier pleadings when the claims arose out of the same conduct, transaction, or occurrence set out in the earlier pleading. K.S.A. 60-215(c)(2). Assuming that we may characterize the Albrights' appellate brief as an "amendment" to their pleadings—as the Albrights have—it seems the newly asserted theory would relate back to the Albrights' second amended counterclaim filed April 18, 2007. Yet, when a claimant amends its pleadings to add new parties to a lawsuit, the claims against those added parties do not relate back to earlier pleadings asserted against a different party. *Schmidt v. Nauman*, 202 Kan. 131, 132-33, 446 P.2d 828 (1968). Therefore, April 18, 2007, is as far back as the Albrights' new claims could possibly relate because the Albrights' original counterclaim, filed January 14, 2005, was brought against a different party, Louisburg Building. Nor is there an applicable exception to this relation-back rule, as the Albrights did not make a mistake in party name or

identity; they are merely trying to bring additional KCPA claims. See K.S.A. 60-215(c)(3).

Considering the nature of the Albrights' new claims against the April 2007 filing date, the record does not contain sufficient facts to determine whether the Albrights' claims are timely. The Albrights now argue that Williams should be found guilty of the same KCPA violations that Louisburg Building was found guilty of—the failure to inform the Albrights of cost overruns in nine budget categories—because Williams admitted to participating in these same failures during the alter-ego trial. Williams began construction on the Albrights home in November 2003, and he left the jobsite in October 2004. Since the filing date was April 18, 2007, the claims would not be timely as to any of Williams' failures to inform of cost overruns that occurred prior to April 18, 2004— roughly halfway through Williams' work on the job. The parties did not admit any evidence during either phase of the trial that pinpointed exactly when certain budget categories were first overrun, and thus it is impossible for this court to determine whether the Albrights' KCPA claims against Williams are barred by the statute of limitations, as some or all of these overruns could have occurred before April 18, 2004.

The second exception to the general rule is also inapplicable. In support of it, the Albrights argue that "[s]ince none of the facts that establish Louisburg [Building]'s KCPA violations or Williams' participation in those violations are legitimately disputed, it would be unjust to deny the Albrights from asserting this theory on appeal." While these facts may not have been disputed, if Williams had been aware that his *personal* liability was at stake, he might have presented an entirely different case, contradicting the evidence now relied on by the Albrights. If anything, consideration of these claims for the first time on appeal would create an injustice— not prevent one—as it would allow the Albrights, having lulled Williams to sleep at trial with their unflagging loyalty to the alter-ego theory, to ambush Williams on appeal with claims regarding his personal actions. In addition, considering these claims would be unjust to the extent that we would be deciding claims potentially barred by the statute of limitations.

The Albrights further argue that because their theory is novel under Kansas law, a ruling from this court would serve the interests of justice in providing guidance to both the bench and bar. This argument is also unpersuasive since the Albrights' claim against Williams would not require consideration of a novel legal theory: individuals who solicit or enforce consumer transactions, regardless of whether they contract directly with the consumer, are "suppliers" subject to the KCPA's prohibition on unconscionable acts in connection with consumer transactions. See K.S.A. 50-624(i), K.S.A. 50-627(a); *Alexander v. Certified Master Builders Corp.*, 268 Kan. 812, 825-26, 1 P.3d 899 (2000).

Because the Albrights failed to raise this theory of liability in the district court and there are no applicable exceptions to the rule against considering newly raised issues, we do not reach the merits of the Albrights' KCPA claims against Williams' in his individual capacity.

II. *The Trial Court Was Correct in Finding that Williams Was Not the Alter Ego of Louisburg Building Because the Albrights Failed to Present Evidence that Williams Used Louisburg Building's Corporate Form to Perpetrate Fraud or Injustice.*

The Albrights sought liability against Williams on the basis that he was the alter ego of the corporation, Louisburg Building. The district court concluded that they had failed to meet their burden of proof on this issue. (The Albrights also sought to have Williams found to be the alter ego of Carson Group, but they have not appealed the district court's adverse decision on that point.)

Whether a corporation's owner is properly considered the alter ego of his or her corporation is question of fact. *Emprise Bank v. Rumisek*, 42 Kan. App. 2d 498, 520, 215 P.3d 621 (2009), *rev. denied* 290 Kan. 1093 (2010). The district court here found that the Albrights had failed to meet their burden of proof, which is a negative factual finding. Upon review of such a finding in a case in which the facts are tried to the district court, "the party challenging the finding must prove arbitrary disregard of undisputed evidence," or "some extrinsic consideration such as bias, passion, or

prejudice." *Hall v. Dillon Companies, Inc.*, 286 Kan. 777, 781, 189 P.3d 508 (2008).

Generally, the owners of a corporation are not personally liable for the corporation's debts. But the corporate entity may be disregarded, and the owners may be held liable for the corporation's debts. *Amoco Chemicals Corporation. v. Bach*, 222 Kan. 589, 593, 567 P.2d 1337 (1977). The usual situation in which this rule is applied is where a corporation's owner is found to be the alter ego of the corporation—the individual uses the corporation "merely as an instrumentality to conduct his or her own personal business." *Emprise Bank*, 42 Kan. App. 2d 498, Syl. ¶ 14. The Kansas Supreme Court recently stated the factors that should be considered in making the alter-ego inquiry:

" '(1) Undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stockholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders, and (8) the use of the corporate entity in promoting injustice or fraud.' " *State ex rel. Graeber v. Marion County Landfill, Inc.*, 276 Kan. 328, 355, 76 P.3d 1000 (2003).

Not all of the factors must be present, and the presence of any one factor could be enough to justify disregarding the corporate entity. See *State ex rel. Graeber*, 276 Kan. at 355.

Williams defended against the Albrights' alter-ego theory by presenting testimony from certified professional accountant Mark Hauber, who prepared taxes and annual reports for Louisburg Building from 2002 to 2005. Hauber had total access to Louisburg Building's financial information, and he testified that Louisburg Building had assets totaling $318,109 at the end of the 2003 and $334,051 at the end of 2004. Hauber testified that, during those years, Williams shared ownership of Louisburg Building on an equal basis with Dave Motley. Hauber also filed federal-income-tax returns, Kansas partnership-income-tax returns, and annual reports with the Kansas Secretary of State on behalf of Louisburg Building in the years 2003 and 2004. Hauber testified that Louisburg Building's members were receiving payments from Louisburg Building's profits, as is customary for limited-liability companies.

Hauber said he saw no evidence that Williams was siphoning any funds from Louisburg Building for his own personal use. In sum, Hauber testified that Louisburg Building maintained all the normal formalities of a limited-liability company.

The Albrights did not try to rebut any of this testimony but instead focused on the relationship between Carson Group and Louisburg Building—they shared the same office space, telephone system, computer network, and occasionally one employee. Also, at the time of trial, Williams had become the sole owner of Louisburg Building and was also the sole owner of Carson Group.

At the conclusion of the alter-ego trial, the court determined that the Albrights failed to meet their burden of proving that Williams and Carson were the alter ego of Louisburg Building as they did not show any of the relevant factors: Louisburg Building was properly capitalized; Louisburg Building maintained the proper corporate formalities; the Albrights failed to show that Louisburg Building was not making customary payments to its members for a limited-liability company; the Albrights failed to show that Williams siphoned funds out of Louisburg Building; the Albrights failed to show that Louisburg Building had nonfunctioning officers or directors; the Albrights failed to show that Louisburg Building did not keep corporate records; the Albrights failed to show that Williams used Louisburg Building as a facade for his personal dealings; and most importantly, the Albrights failed to show what fraud or injustice would result from honoring the legal fiction that Louisburg Building was an entity separate from Williams. Because the Albrights failed to prove Williams or Carson Group was the alter ego of Louisburg Building, the trial court dismissed the Albrights' claims against both with prejudice.

On appeal, the Albrights try to shift the basis of their claim for Williams' personal liability. Rather than argue that the trial court erred in failing to find Williams' liable as the alter ego of Louisburg Building, they now note that the "overriding consideration" in applying the alter-ego analysis is "whether injustice or an inequitable result would occur if the fiction of separate legal entities was upheld." The Albrights posit that such injustice and inequity exists in this case because "Williams, individually and through his legal fic-

tions of Louisburg Building and Carson [Group]," acting together, overbilled the Albrights, performed substandard work, took an excessive amount of time to build the Albrights' home, and deprived the Albrights of "the dream home that they had bargained for with Louisburg Building."

The Albrights are correct that there is a secondary basis under individual liability that may be imposed: A corporate entity may also be disregarded upon a general showing that the interests of justice require it. See *Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, Syl. ¶ 4, 473 P.2d 33 (1970); *Hill v. Kansas Dept. of Labor*, 42 Kan. App. 2d 215, 234, 210 P.3d 647 (2009), *aff'd in part and rev'd in part on other grounds* 292 Kan. 17, 248 P.3d 1287 (2011). This second, less-developed theory for disregarding the corporate entity does not require a showing that the corporation itself was used to perpetrate the injustice, but there must at least be some injustice or inequity that would result from maintaining the legal fiction of separate entities. See *Kilpatrick Bros.*, 205 Kan. 787, Syl. ¶ 4; *Hill*, 42 Kan. App. 2d at 235-38. Under either theory, the decision to disregard the corporate entity should be "exercised reluctantly and cautiously." *Amoco Chemicals Corp.*, 222 Kan. 589, Syl. ¶ 3.

The arguments on appeal focus exclusively on fraud or injustice and whether the corporation was used as a facade. The evidence the Albrights rely on seems aimed at whether Carson Group's corporate form—as opposed to Louisburg Building's—was used to perpetrate some fraud or injustice on the Albrights. Williams' failure to tell the Albrights that he owned Carson Group and his alleged use of Carson Group employees to run up the cost of construction could suggest that either Louisburg Building or Williams was using Carson Group as a facade. But even if such use were present, it would not prove the claim the Albrights made below, *i.e.*, that Williams used Louisburg Building as an alter ego.

Nor does it support a finding of personal liability against Williams under the general interests-of-justice approach. The Albrights have no judgment against Carson Group, so disregarding Carson Group's corporate status to hold Williams liable for the company's debts would gain nothing for the Albrights. Moreover,

the Albrights always knew that Williams was an owner or coowner of Louisburg Building. There simply is nothing in the way the corporate form of Louisburg Building was used here that caused an injustice to the Albrights. If there was any misuse of any corporate form, it was Williams' use of Carson Group as a subcontractor without revealing his ownership in Carson Group; as we've already noted, even if we disregard the Carson Group's corporate status, that provides no benefit to the Albrights.

Even under the interests-of-justice theory, there must be some showing that it would be inequitable or unjust to uphold the legal fiction of separate entities. Merely showing that some kind of injustice occurred is not sufficient—to disregard the corporate entity under this theory, it must be "necessary to achieve equity." *Service Iron Foundry, Inc. v. M.A. Bell Co.*, 2 Kan. App. 2d 662, 673, 588 P.2d 463 (1978) (citing *Kilpatrick Bros.*, 205 Kan. 787); see *Hill*, 42 Kan. App. 2d at 437-38. In other words, a fraud or injustice committed by a corporation ordinarily will be remedied by the penalties that the law assesses against that corporation as a remedy. It is the corporation's inability or unwillingness to comply with those remedies that prompts disregarding the corporate entity. See *Naples v. Keystone Bldg. and Dev. Corp.*, 295 Conn. 214, 237, 990 A.2d 326 (2010) (refusing to disregard the corporate entity because the plaintiffs failed "to point to evidence that declining to pierce the corporate veil would defeat justice by leaving them without compensation for the breach of the construction contract"); *Advanced Constr. Corp. v. Pilecki*, 901 A.2d 189, 195 (Me. 2006) (refusing to pierce the corporate veil because "[t]here was no evidence from which the jury could find that a verdict against [the corporation] would be worth less than a verdict against [its shareholder]"); *cf. Kvassay v. Murray*, 15 Kan. App. 2d 426, 440, 808 P.2d 896, *rev. denied* 284 Kan. 996 (1991) (approving trial court decision to pierce corporate veil when otherwise the plaintiff "would be unable to collect damages to which he is entitled"); *Agway, Inc. v. Brooks*, 790 A.2d 438, 442 (Vt. 2001) ("We will uphold a trial court decision to pierce the corporate veil where it has done so, as in this case, to correct the use of the corporate form to evade legitimate claims of judgment creditors.").

The district court found that the Albrights had failed to meet their burden of proof to hold Williams personally liable. Substantial evidence supports that finding with respect to the traditional alter-ego factor test. And although the Albrights did not make the argument to the trial court that they are making here regarding the general interest-of-justice liability theory, the district court addressed injustice when considering the traditional alter-ego factor of whether the corporate entity had been misused to perpetrate fraud or injustice: "The allegations that the [Albrights] are making as far as fraud and injustice as to both Damon Williams and Carson Group mostly relate to the quality of work and the extent of the building—billing for construction services provided, rather than some sort of confusion between the entities . . . ." Under the negative-findings standard of review, we may reverse the district court's factual finding on whether there's a sufficient factual basis to disregard corporate entities only if the district court has disregarded undisputed evidence or acted based on passion or bias. That certainly is not the case here.

III. *The Trial Court Erred in Calculating the Damages from Louisburg Buildings' Breach of Contract Because the Amount Awarded Did Not Place the Albrights in the Position They Would Have Been Had the Contract Been Fully Performed.*

The district court found that Louisburg Building breached the construction contract in two respects. First, Louisburg Building breached its obligation to construct the residence in a "workmanlike manner" by hiring Carson Group, whose shortcomings included "[i]nadequate deck construction, defective installation of windows, defective installation of doors, defective installation of finished beams, and improper attempts to install flooring." The district court found that Louisburg Building also breached its obligation to construct the home in accordance with standard residential construction practices in the area by "failing to create written indicia of change orders which were impacting the total cost of the project." The court determined that such standard practices required Louisburg Building to "prepare a writing describing the change and indicating any associated cost modification" prior to a

change being implemented. Notably, the district court did not find that Louisburg Building's failure to build the Albrights home for the price estimated in the bid sheet was a breach of contract. The court determined that "cost-plus" construction contracts, by nature, anticipate change orders that will affect the cost of the project.

The district court also found that the Albrights partially breached the contract by using $30,000 from the construction account to pay for items purchased in Mexico and then failing to pay Louisburg Building $4,500 for the 15% cost-of-construction fee that was allocable to those items.

The Albrights sought breach-of-contract damages for $183,153.24. The Albrights calculated this figure by taking the total cost of constructing their home, $874,426.18, and then subtracting the price of their contract with Louisburg Building, the cost of additional construction not contemplated by their original contract, and the actual costs that were not supported by the evidence presented at trial.

The district court disagreed with the Albrights' calculations and instead awarded damages in the amount of $33,306.54. The district court reached this number by adopting the Albrights' methodology but made three adjustments to the calculation. First, because of the district court's concern that architectural defects—rather than Louisburg Building's breach—were responsible for some of the increased construction costs, it used $780,000 as a starting figure for its damages calculation, the amount that the Albrights' expert witness testified it should have cost to build the home the Albrights had originally envisioned. Second, the trial court determined that cost overruns in the "Steel I beams & Post & Set" and "Lumber, Rough Framing Etc." categories were due to architectural defects as well and subtracted $20,920.15 from the Albrights' suggested calculation. Third, the trial court subtracted another $34,500 for the Albrights' partial breach in purchasing items in Mexico.

The Albrights argue that the trial court erred in making all three adjustments to their suggested damages calculation. First, the Albrights contend that, by adjusting downward the starting figure for the calculations, the district court failed to return the Albrights to the position they would have been in had the contract been fully

performed. Second, the Albrights argue that the district court erred by allocating increased lumber and steel costs to architectural defects because the record did not support such an adjustment. Third, the Albrights argue it was error for the district court to offset their damages by the $30,000 the Albrights took from the construction account. The Albrights contend this was only a technical breach and that the only resulting damage to Louisburg Building was that it did not receive its $4,500 fee.

Louisburg Building replies that substantial evidence supported the district court's findings of fact in relation to damages and that this court should therefore uphold the district court's findings.

The Albrights' challenges to the district court's first and third adjustments—changing the starting figure and awarding Louisburg Building off-setting damages for the Albrights' breach—both implicate whether the court correctly applied the proper measure of damages, raising a question of law over which this court has unlimited review. *Burgess v. Shampooch Pet Industries, Inc.*, 35 Kan. App. 2d 458, 460-61, 131 P.3d 1248 (2006). The Albrights' challenge to the district court's second adjustment—allocating overruns in the steel and lumber categories to architectural defects—implicates the district court's factual findings, which we review to determine whether substantial evidence supports them. See *Source Direct, Inc. v. Mantell*, 19 Kan. App. 2d 399, 408-11, 870 P.2d 686 (1994); see also *New Dimensions Products, Inc. v. Flambeau Corp.*, 17 Kan. App. 2d 852, 857, 844 P.2d 768 (1993) (applying mixed standard of review where appellant challenged both the method of computing damages and the evidence supporting the trial court's finding).

The basic goal in awarding contract damages is to put the nonbreaching party in the position the party would have been in had the breach never occurred, without allowing that party a windfall. *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 789, 107 P.3d 1219 (2005). In other words, the district court should seek to protect the nonbreaching party's "expectation interest." *Lindemuth, Inc. v. Morgason*, 2006 WL 768911, at *1 (Kan. App. 2006) (unpublished decision). The complaining party is burdened with showing that breach and damage occurred, and the party must

provide a reasonable basis for computing that damage. *State ex rel. Stovall*, 278 Kan. at 789. A party may not recover damages that are not the proximate result of the breach or that are "remote, contingent, or speculative in character. [Citation omitted]" *State ex rel. Stovall*, 278 Kan. at 789.

Expectation damages are usually determined by taking the difference in value between the performance contracted for and the defective performance that was given. Restatement (Second) of Contracts § 347(a) (1979). But in the context of a construction contract, where the breaching contractor leaves a project incomplete and the owner pays to have the project completed by someone else, awarding the owner the cost of completing construction is one way to protect the owner's expectation interest. Restatement (Second) of Contracts § 348, comment c (1979); see *State ex rel. Stovall*, 278 Kan. at 789-90; *English Village Properties, Inc. v. Boettcher & Lieurance Constr. Co.*, 7 Kan. App. 2d 307, 315, 640 P.2d 1282, *rev. denied* 231 Kan. 799 (1982). But the owner must make reasonable efforts to avoid excessive costs, or "loss," in completing the construction. Restatement (Second) of Contracts § 350(2) (1979). In calculating expectation damages, a court must also reduce the recovery by any cost avoided as a result of the breach, which is often represented by the portion of the contract price that the owner did not have to pay the contractor as a result of the contractor's leaving the project. See Restatement (Second) of Contracts §§ 347(c), 348, illustration 2.

The Albrights' first claim is that their own measure of damages protects their expectation interest, while the district court's measure with the adjusted starting figure does not. Upon first glance, it seems that the basic premise of the Albrights' formula will successfully determine expectation damages in this context as it mirrors the Restatement's approach. The Albrights' formula subtracts the contract price that the Albrights expected to pay from the total cost of construction, leaving only the unexpected cost of completion; similarly, the Restatement's formula subtracts the portion of the contract price that the Albrights expected to pay, but avoided, from the cost of finishing construction after Louisburg Building left the project, again, leaving only the unexpected cost of comple-

tion. Indeed, the two formulas will always produce the same number.

The question then becomes whether the Albrights' expectation interest is better protected by using the amount that the Albrights *actually* incurred to complete the home or by using the amount that an expert witness said that the Albrights *should have* incurred. Given that parties may not recover damages not proximately related to the breach, the district court's wariness that some of the ultimate cost of completion was due to architectural defects may have been a valid justification for its adjustment. This is especially true considering the burden of proof is on the party seeking damages. Yet, the district court's adjustment was purely speculative: it is not clear why the roughly $90,000 reduction in the starting figure is at all indicative of how much added cost was allocable to architectural defects.

But this court need not decide between these two starting figures because the application of the formula to these facts suffers from a much more basic problem: the formula's ability to put the parties back in their expected positions is dependent on the existence of a fixed-price contract, and here, there was no fixed price. In a case like this, where the district court found that cost-plus contracts, by nature, anticipate cost overruns, this formula breaks down. Because the cost of construction is subject to change, the contract price can no longer be used as a measuring stick for the parties' expectations as the formula contemplates—the parties do not have an expectation capable of protection, at least not with respect to the ultimate cost of construction. To put it another way, using this formula incorrectly assumes that any cost greater than the original contract estimate is attributable to Louisburg Building's breach. In fact, some of those costs could be due to the reality that the high-quality design of the Albrights' home could not be built for the initially estimated price. This conclusion is furthered by the expert testimony that the house contemplated by the original contract should have cost $780,000, not $545,000.

At the heart of the Albrights' formula—and their grievance with Louisburg Building—is their fundamental misunderstanding that the contract guaranteed them their dream home for the price es-

timated in the bid sheet that was attached to the contract. No doubt, this underestimation was extreme and misleading but failing to deliver on it was not a breach of the contract, at least not according to the district court. The district court found that the contract merely estimated the price of construction, and the Albrights would have the opportunity to either approve or disapprove costs as they began exceeding budget. This arrangement was a necessity considering the plans incorporated into the contract contained no details as to the finish, fixtures, or appliances that were to go into the house.

Of course, the Albrights were never given a chance to approve or disapprove the costs that exceeded the contract estimate, as Louisburg Building also breached the contract by failing to submit change orders notifying the Albrights of any cost overruns. But this second breach should not make Louisburg Building responsible for covering the difference between its estimate and the amount it actually cost to build the Albrights' home in the situation here, in which the district court found that this was a cost-plus contract. Given the nature of this breach, it seems the Albrights are currently in the same position they would have been had this particular obligation been fully performed because even if the Albrights knew in advance that construction costs were exceeding the original estimate, this knowledge would have done nothing to lower the ultimate, actual cost of construction. In other words, the district court's formula attempts to put the Albrights in a position that they never would have found themselves in: if Louisburg Building notified the Albrights of these cost overruns, the Albrights either would have approved the costs, and paid more money in an effort to stay true to their original wishes, or they would have modified their desires and stayed under budget. The district court's formula attempts to provide the best of both worlds—the Albrights would be in the anomalous position of having the home that they originally contracted for (or something close to it)—but for a price that was never possible, nor guaranteed by contract.

In this cost-plus scenario, where the contract does not contemplate a fixed price, the proper method of calculating damages—and returning the Albrights to their expected position—should aim

to figure out how many otherwise-avoidable expenses the Albrights incurred as a result of Louisburg Building's breach. The best way to reach this number is to pinpoint the amount that the Albrights had to pay to repair or redo Louisburg Building's work that the district court found was not "workmanlike" and in breach of the contract, or if the work was not redone, the amount that this poor workmanship decreased the overall value of the property. Calculations of this nature would be in accord with the principle of expectation damages espoused by Kansas courts, as well as the view taken by the Restatement. Any calculation based on the overall increase in the cost of construction fails to realize the nature of Louisburg Building's breach and does not respect the parties' expectation interests.

Similarly, the district court's adjustment regarding the Albrights' breach failed to return the parties to their rightful positions. Although the evidence supported the finding that Troy Albright breached the contract by withdrawing money from the construction account, giving this money to Louisburg Building failed to place Louisburg Building in the position it would have been but for Albright's breach. Under the terms of the contract, Louisburg Building did not have an unconditional right to all of the money in the construction account; rather, it was meant to compensate Louisburg Building for the cost of construction. There was no evidence that Louisburg Building was left uncompensated for some construction cost as a result of Albright using this money to purchase items in Mexico, so there is no reason that the court should have awarded this money to Louisburg Building as damages. In other words, even if Albright had not committed this breach, Louisburg Building would not have ended up with the $30,000.

The Albrights also challenged the district court's second adjustment, based on its finding that architectural defects were responsible for the cost overruns in the steel and lumber categories. This factual finding was supported by substantial evidence in the form of testimony from multiple witnesses: Aycock, Troy Albright, and Williams all expressed uncertainty as to whether lumber and steel budget overruns were in fact caused by Louisburg Building, not architectural defects. In light of the preceding discussion, though,

determining the costs allocable to architectural defects may not be helpful or necessary to determining the costs allocable to Louisburg Building's breach because the excess construction costs were not necessarily due solely to these two variables.

Because the trial court's formula did not put the Albrights in the position they would have been had the contract been fully performed, we remand the case to the district court for a recalculation of damages focusing on the Albrights' unexpected costs incurred in repairing or redoing Louisburg Building's defective work. See *Lindemuth*, 2006 WL 768911, at *2-3 (remanding where trial court did not apply the correct measure of damages).

IV. *The Trial Court's Findings that Louisburg Building and Williams' Use of Carson Group Was Not Unconscionable Under the KCPA Was Not in Error.*

The Albrights argue that the trial court should have found that both Louisburg Building and Williams violated the KCPA simply by using Carson Group, a company solely owned by Williams, as a subcontractor. We review the district court's conclusion on unconscionability under the KCPA with a hybrid standard of review. Theoretically, we have unlimited review because it is a legal conclusion, but our Supreme Court has clarified that our review must be "tempered" by the notion that a finding of unconscionability is best " 'left to the sound discretion of the trial court to be determined under the peculiar circumstances of each case.' [Citation omitted.]" *State ex rel. Stovall v. DVM Enterprises, Inc.*, 275 Kan. 243, 249, 62 P.3d 653 (2003). This moderated review is appropriate because " ' " '[w]ith a concept so nebulous as "unconscionability" involved, it is necessary that a certain amount of leeway be granted trial courts when deciding the unconscionability of acts.' " ' [Citations omitted.]" *DVM Enterprises*, 275 Kan. at 249. To the extent that resolving this claim requires this court to construe the provisions of the KCPA, this court also has unlimited review over questions of statutory interpretation. *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009).

The district court concluded that merely using the Carson Group as a subcontractor while failing to disclose Williams' ownership of

Carson Group was not unconscionable here. Under our standard of review, we find that the district court's conclusion was within its discretion.

The Albrights argue that the trial court erred by failing to find that the amount Louisburg Building billed the Albrights for Carson Group's work was unconscionable, and thus in violation of the KCPA. The trial court found that "Carson [Group] billed [Louisburg Building] for work done on the Albrights' home on an hourly basis, with no bids given for their work or restrictions as to how long the work could take or at what cost." The trial court also determined that "Carson's employees were inexperienced in the construction of new homes, and one of the employees admitted to Troy Albright that he had never performed this type of work before. One of the billings from Carson included time for the Carson supervisor to correct an employee on the project." The trial court found that these "practices resulted in [Louisburg Building] billing the Albrights for cost over-runs." On appeal, the Albrights do not point to any additional facts from the record that help prove any claimed KCPA violations but instead contend that the trial court's ruling contravened its own findings of fact.

The Albrights argue that these findings prove that Louisburg Building violated the KCPA because Louisburg Building hired Carson Group, which employed incompetent workers who made many mistakes during construction and overbilled for work, which in turn allowed Louisburg Building to collect a greater 15% cost-of-construction fee. The Albrights argue that Louisburg Building's hiring of Carson Group was a conflict of interest because Williams, a 50% member in Louisburg Building, was also the sole owner of Carson Group.

Louisburg Building replies that the Albrights failed to assert this theory of liability in the pretrial order and therefore "failed to preserve this issue for trial," thus implying that the issue may not be considered on appeal. The Albrights reply that the pretrial order specifically alleges all of the facts necessary to form the KCPA violations in question and that the order expressly reflects that they characterized each of these allegations as constituting KCPA violations.

As a preliminary matter, a review of the pretrial order reveals that the Albrights did indeed assert that Louisburg Building's overbilling, misrepresentations, and general incompetence were all violations of the KCPA. Despite referencing Carson Group by name only once, the conduct described in the pretrial order adequately encompasses the more specific conduct now complained of on appeal. Therefore, we reject Louisburg Building's argument that this issue was not preserved for trial or for appellate review.

The KCPA prohibits suppliers from engaging in unconscionable acts or practices in connection with consumer transactions. K.S.A. 50-627. In making the unconscionability determination, the statute directs the district court to consider whether the supplier knew or had reason to know of certain circumstances, including these:

"(1) The supplier took advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor;

. . . .

"(3) the consumer was unable to receive a material benefit from the subject of the transaction;

. . . .

"(6) the supplier made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment." K.S.A. 50-627(b)(1), (3), (6).

These are the only statutory examples that might possibly apply to Louisburg Building's use of Carson Group and are the only ones relied on by the Albrights on appeal. But the statutory list is not exclusive, so the Albrights' claims should not stand or fall based solely on the presence or absence of these statutory circumstances. See *State ex rel. Stovall v. ConfiMed.com*, 272 Kan. 1313, Syl. ¶ 1, 38 P.3d 707 (2002).

In *ConfiMed.com*, the Kansas Supreme Court carefully considered the question of unconscionability under the KCPA. The court first turned to the 1973 legislative comments to shed more light on the type of conduct that the statutory examples sought to prohibit:

" 'Subsection (b)(1) includes such conduct as selling an English-language encyclopedia set for personal use to a Spanish American bachelor laborer who does

not read English, or using legal verbiage in a manner which cannot be readily comprehended by a low-income consumer who both reads and speaks English.

. . . .

" 'Subsection (b)(3) includes such conduct as the sale of two expensive vacuum cleaners to two poor families whom the salesman knows, or has reason to know, share the same apartment and the same rug.

. . . .

" 'Subsection (b)(6) applies to misleading subjective expressions of opinion on which a supplier should reasonably expect a consumer to rely to his detriment. For example, a violation of this subsection would occur if a prospective purchaser asked a supplier what the useful life of a paint job was and the supplier, with reason to know that repainting would be necessary within two years, responded, "in my opinion the paint will wear like iron." ' " *ConfiMed.com*, 272 Kan. at 1318-19 (quoting K.S.A. 50-627, Kansas Comment, 1973).

The comments also suggested that the KCPA's prohibition on unconscionable conduct traditionally applied to advertising techniques, contract terms, debt collection practices, and limitations on implied warranties. *ConfiMed.com*, 272 Kan. at 1320-21. The court recognized that the contract-terms category may also include the situation where the contract itself is valid, but subsequent deceptive conduct taints the transaction as unconscionable. *ConfiMed.com*, 272 Kan. at 1321. But even with this expansive view of the contract category, the court noted that the general guidelines for determining unconscionability remain in place: there must be " 'some element of deceptive bargaining conduct present *as well as* unequal bargaining power to render the contract between the parties unconscionable.' " (Emphasis added.) *ConfiMed.com*, 272 Kan. at 1321. When the record does not contain any evidence of " ' "deceptive or oppressive practices, overreaching, intentional misstatements, or concealment of facts," there is no claim under the KCPA.' [Citations omitted.]" *ConfiMed.com*, 272 Kan. at 1323. In other words, transactions "that merely appear unfair, or in retrospect are bad bargains, do not necessarily state a claim under the [KCPA.]" *ConfiMed.com*, 272 Kan. 1313, Syl. ¶ 5.

In this case, Louisburg Building's use of Carson Group as a subcontractor may have been unfair, but the district court could still find that it did not rise to the level of unconscionable conduct. First, Louisburg Building's use of Carson does not seem to impli-

cate any of the three statutory circumstances relied on by the Albrights. Second, there does not seem to be any other deception or imbalance of power that would suggest some kind of unconscionable conduct not specifically set out in the statute.

First, the Albrights argue that Louisburg Building took advantage of the Albrights' inability to protect their own interests because the Albrights had no way of knowing that Carson Group's employees consisted of inexperienced workers. In making this argument, the Albrights construe subsection (b)(1) as necessarily applying to the situation where the buyer is merely unfamiliar with the supplier's services. To the contrary, the language of the statute and the 1973 comments suggest that the primary application of this provision is to a situation where the buyer is incapable of comprehending contractual terms due to some language barrier, mental incapacity, or the prevalence of legal jargon. There was no barrier that prevented the Albrights from looking into Louisburg Building or Carson Group's track record with greater detail, had they wished. One might characterize the Albrights' argument as suggesting that their lack of familiarity with the construction industry was so substantial that they were incapable of determining whether Carson Group's work was defective and that Louisburg Building took advantage of that lack of familiarity. But requiring a finding of unconscionability on this basis would likely render all construction contracts unconscionable due to this common disparity in knowledge. In any case, the district court had substantial evidence before it that the Albrights did not suffer from this lack of knowledge as they had previously built a home, conducted years of research on the home they desired, and were able to successfully discern when Carson Group's work was defective.

The Albrights also rely on subsection (b)(6), arguing that, by hiring Carson Group and billing the Albrights for Carson Group's work, Louisburg Building was "expressing" its opinion that Carson Group was qualified to build the Albrights' home and that the Albrights would rely on this "statement" to their detriment. There are two problems with this argument. First, assuming that the act of hiring and billing for Carson Group expressed anything at all, it is not clear that it was even possible for the Albrights to rely on

such an expression. Under the contract, Louisburg Building had the sole power to choose subcontractors—it was not as if the Albrights relied on this "statement" to "approve" Carson Group. Also, prior to the time of the hiring and billing, the Albrights were already relying on Louisburg Building to choose capable subcontractors—this was Louisburg Building's basic duty under the contract. Turning again to the 1973 comments, the Albrights' argument does not appear to implicate the primary situation the legislature had in mind, where the supplier makes an express, misleading statement of opinion to the prospective consumer, meant to induce that consumer into buying something.

Second, interpreting the KCPA so broadly as to prohibit actions that have the potential to mislead by implication could create an absurd result. In essence, the Albrights would like to construe subsection (b)(6) as sweeping in any supplier's request for payment under a contract on the grounds that such a request implicitly represents that the contract was (or is being) properly performed. Such an interpretation would create a violation of the KCPA for every payment request made by a party that was later determined to be in breach of the contract. Statutes should be construed to avoid such unreasonable results. *Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, 89, 106 P.3d 492 (2005).

The Albrights' argument under subsection (b)(3) is more substantial. The Albrights argue that they were unable to receive a material benefit from their construction contract with Louisburg Building because Carson employees "were incompetent and made repeated and costly mistakes throughout the construction." In hindsight, it appears that much of Carson's work had to be redone by Taylor Aycock, the contractor that the Albrights hired to finish their home. To that extent, the Albrights arguably did not receive any material benefit from Louisburg Building's use of Carson Group. One could argue that, due to Carson Group's inexperience, Louisburg Building "should have known" that Carson Group's work would need to be redone and that the Albrights would not receive any material benefit from the work done by Carson. See K.S.A. 50-627(b).

But inexperience does not necessarily equate to inability, and there certainly isn't undisputed evidence that Louisburg Building knew that Carson Group was incapable of completing work that would provide a material benefit to the Albrights. The district court found no unconscionability, and it may well have concluded that even though some work had to be redone, the Albrights still received a material benefit from Carson Group work.

In addition, once again, the facts of the Albrights' case are certainly substantially different from the primary situation the legislature had in mind under subsection (b)(3). As the 1973 comments demonstrate, the provision seems aimed at the situation where it is factually impossible for the buyer to derive any benefit from the product or service, *e.g.*, where a second vacuum will not get the rug any cleaner than the first. See *Dodson v. U-Needa Self Storage*, 32 Kan. App. 2d 1213, 1218-19, 96 P.3d 667 (2004) (applying subsection [b][3] to a situation where the same storage unit was rented to two different parties). This is not the situation where Louisburg Building was sending Carson Group employees to do work already completed by other subcontractors—Carson was not the unneeded second vacuum.

The unconscionability inquiry does not end with these specific statutory factors, which are not exclusive. The Albrights have also suggested it was unconscionable for Louisburg Building to allow Carson Group to bill on an open-ended, hourly basis, ultimately increasing Louisburg Building's total fee. The Albrights argue the unconscionability of this scheme was furthered because Louisburg Building's half owner, Williams, was also the sole owner of Carson Group. But as the Kansas Supreme Court has previously stated, there must be some evidence of both deceptive behavior and unequal power between the parties to prove a violation of the KCPA's prohibition on unconscionable conduct. Relying only on the district court's findings of fact, the Albrights have not pointed to any evidence that suggests that Williams—acting on behalf of Louisburg Building—actively concealed his ownership in Carson Group or did not truthfully answer the Albrights when they asked Williams about who owned Carson. In fact, the record suggests that Williams regularly referred to Carson Group employees as "his men" in front

of the Albrights and that he admitted that he owned Carson Group when the Albrights finally asked.

Although Louisburg Building did not offer up that it would be using a subcontractor wholly owned by Williams, Kansas caselaw generally suggests that one must be under a duty to disclose a fact before the mere omission of that fact can rise to the level of deception. See *Williamson v. Amrani*, 283 Kan. 227, 246, 152 P.3d 60 (2007) (interpreting the KCPA's prohibition on deceptive acts under KSA 50-626), *superseded by statute on other grounds as noted in Kelly v. VinZant*, 287 Kan. 509, 521, 197 P.3d 803 (2008). Such a duty is present when the relationship between the parties, the customs in the trade, or any other objective circumtances lead one party to reasonably expect disclosure of the omitted facts. *Williamson*, 283 Kan. at 246. In this case, the Albrights' expert witness suggested that it was customary in the construction industry for a builder to disclose the use of a wholly owned subsidiary as a subcontractor. The district court's findings of fact, however, made no mention of this industry custom, and the Albrights have not challenged those findings with respect to this issue. In any case, Louisburg Building was not the owner of Carson, Williams was, and he owned only one-half of Louisburg Building when Carson Group began its work.

To be sure, Louisburg Building and the Albrights were not on equal footing with respect to the decision to use Carson: the contract gave Louisburg Building the sole power to choose subcontractors. But whether Louisburg Building could have used this position of power in an unconscionable manner is purely hypothetical because the Albrights never asked Louisburg Building to quit using Carson Group before the Albrights terminated the contract with Louisburg Building altogether.

Unconscionable behavior generally requires both deceptive conduct as well as unequal bargaining power amongst the parties. *ConfiMed.com*, 272 Kan. at 1321. The district court may well have found neither element was met with regard to the unconscionability claim. This is just the sort of case in which our Supreme Court admonishes to leave the determination of unconscionability to the district court, which has heard the evidence and carefully weighed

all of it under the legal standards for determining unconscionability. We find no error in the district court's discretionary call in this case. None of the circumstances set out in K.S.A. 50-627(b) is specifically found on our facts, and Carson Group was not a wholly owned subsidiary of Louisburg Building.

V. *The Trial Court Did Not Abuse Its Discretion in Denying the Albrights' Request for Attorney Fees under the KCPA.*

Given their successful KCPA claims, the Albrights requested attorney fees, which may be awarded in KCPA cases. See K.S.A. 50-634(e). The trial court denied this request for three reasons: (1) Kansas Rule of Professional Conduct 1.5 (2010 Kan. Ct. R. Annot. 458) suggested that the award of fees was not justified in this case; (2) the Albrights pursued multiple theories of recovery, some of which do not permit the award of attorney fees; and (3) the Albrights asserted 127 KCPA violations but were only successful on 9 of them, so Louisburg Building prevailed in the vast majority of KCPA issues raised.

The Albrights argue that the trial court erred by not awarding them attorney fees, and they seek an award of *all* of their fees, not just a portion. They contend that all of their claims were so interrelated that their prosecution required proof of essentially the same facts; thus, all fees incurred on all claims should be awarded. Despite Louisburg Building's successful defense of 118 out of 127 KCPA claims, the Albrights argue that 9 violations is a "substantial number" and that they only needed to prevail on 1 violation to merit a fee award. Louisburg Building replies that the district court's decision to deny fees was not an abuse of discretion because the award of attorney fees is permissive, not mandatory, under the KCPA.

We review the district court's refusal to award attorney fees under the KCPA under an abuse of discretion standard, so we may reverse only if no reasonable person would agree with the district court. *Dodson*, 32 Kan. App. 2d at 1220. The KCPA explicitly makes the award discretionary; it states that a court *"may* award" reasonable attorney fees to the prevailing consumer where (1) "a supplier has committed an act or practice that violates this act,"

and (2) the "action under this section has been terminated by a judgment, or settled." (Emphasis added.) K.S.A. 50-634(e)(1)-(2). Nothing in the statute provides any further guidance as to when an award of attorney fees is appropriate. Given the word "may," the statute suggests that the district court has absolute discretion in deciding whether to award fees, so long as the other statutory prerequisites are satisfied. This court has previously adopted this interpretation of the statute, stating that the award of attorney fees under the KCPA "is purely discretionary with the trial court." *Bell v. Kent-Brown Chevrolet Co.*, 1 Kan. App. 2d 131, 135, 561 P.2d 907 (1977), *superseded by statute on other grounds as noted in Porras v. Bell*, 18 Kan. App. 2d 569, 570, 857 P.2d 676 (1993).

Whatever the outer boundaries of this discretion may be, the district court did not abuse it here. Our cases provide little guidance on whether there are some cases in which a fee award must be made. When a fee award is made, our court has looked to the factors set out in Kansas Rule of Professional Conduct 1.5(a) to determine the reasonable amount of the award. See *DeSpiegelaere v. Killion*, 24 Kan. App. 2d 542, 550, 947 P.2d 1039 (1997). The factors include, among others, "the amount involved and the results obtained." Kansas Rule of Professional Conduct 1.5(a)(4) (2010 Kan. Ct. R. Annot. 458). Generally, these factors do not seem geared toward the threshold decision of whether to award any fees at all, but in at least one case, this court has examined the results obtained in upholding a district court's refusal to award fees. See *Dodson*, 32 Kan. App. 2d at 1221 (holding that a successful claimant under the KCPA was not entitled to attorney fees where the claimant had failed on all other claims). Given that the Albrights only succeeded on 9 of 127 KCPA claims, a reasonable person could find that Louisburg Building prevailed on the vast majority of claims, and thus the Albrights were not deserving of a fee award.

The Albrights argue, however, that even a single violation of the KCPA merits a fee award. In one sense, their argument carries weight because "any violation of the KCPA by a supplier constitutes grounds for attorney fees." *Unruh v. Purina Mills*, 289 Kan. 1185, 1201, 221 P.3d 1130 (2009). But the idea that one violation *may* constitute grounds for a fee award does not equate to the idea

that such fees *must* be awarded. The Albrights are essentially arguing that the statute mandates an award of attorney fees for any single violation and that the district court abused its discretion in failing to follow this mandate. If the legislature had intended this result, it could have simply used the word "shall" or "must" rather than "may." See K.S.A. 50-634(e). Although the KCPA directs courts to construe its terms liberally to protect consumers, this does not override the legislature's deliberate choice of the word "may." This seems especially true in light of the existence of other Kansas statutes where the award of attorney fees is nondiscretionary. See *Johnson v. Westhoff Sand Co.*, 281 Kan. 930, 939-40, 135 P.3d 1127 (2006) (interpreting a statute that used the word "shall" and holding the award of fees to be mandatory).

We must note that the district court may have made one legal error in its analysis of the fee-award issue. The district court's journal entry of judgment was not explicit on whether the court considered the potential that the Albrights' KCPA claims were inseparable from their other claims. In such a case, an award of fees may cover the entire amount of fees incurred even though some claims were lost if the claims were so intertwined as to essentially be inseparable. *DeSpiegelaere*, 24 Kan. App. 2d 542, Syl. ¶ 2. The district court's journal entry noted that "the Albrights pursued recovery by multiple theories, some of which do not permit the recovery of fees." That's true but potentially misleading. Some of the theories pursued (like breach of contract) do not provide for a recovery of attorney fees. But if a breach-of-contract claim is inseparable from a KCPA claim and the party wins its KCPA claim, the district court could award the fees incurred in presenting both claims. It's not altogether clear whether the district court understood this point, and it is an abuse of discretion if the district court's decision was made based on a misinterpretation of the law. See *Moore*, 287 Kan. at 135.

But the existence of multiple theories was only one reason that the district court denied fees, and the district court could have denied fees solely based on the Albrights' lack of success on the majority of their KCPA claims. In sum, our record does not clearly demonstrate that the district court misinterpreted the law regard-

ing when fees may be recovered where multiple legal theories are at issue, and even if the district court was in error on that point, it had a valid and independent basis for its discretionary decision to deny the fee-award request. The award of fees in a KCPA case is discretionary, and we find no abuse of discretion in the decision made here.

VI. *The District Court Properly Granted Judgment on the Albrights' Fraud-in-the-Inducement Claims Against Both Louisburg and Williams.*

The Albrights brought fraud-in-the-inducement actions against both Louisburg Building and Williams. Louisburg Building and Williams moved to dismiss the claims, arguing that the 2-year statute of limitations barred the claim against Williams and that the economic-loss doctrine barred both claims. The district court granted the motion as to both parties. Although the district court did not explain its reasoning, the district court's previous journal entry—dismissing an earlier fraudulent misrepresentation claim— suggests that the district court dismissed the fraud-in-the-inducement claims based on the economic-loss doctrine. The Albrights foreshadowed their fraud-in-the-inducement argument in attempting to save their original fraud claim, but the court dismissed their claim based on the economic-loss doctrine.

On appeal, the Albrights argue that the district court erred in dismissing their claims against Louisburg Building and Williams because the economic-loss doctrine does not apply to claims for fraud in the inducement. According to the Albrights, their claim for fraud in the inducement "focuses on the deception utilized by Williams and Louisburg Building to con the Albrights into allowing Louisburg Building to build their house," and the "actual damages suffered by the Albrights in this regard are the hundreds of thousands in additional costs to construct their house."

Although the district court branded its decision to terminate the Albrights' claims a "dismissal," its action is more appropriately characterized as a judgment on the pleadings. The district court did not find that the Albrights had failed to state a claim. It instead found that, based on the pleadings, the Albrights were not entitled

to relief on their claims as a matter of law. See K.S.A. 60-212(c). When the district court has acted under the guise of a motion to dismiss, but has in fact done something else, we adjust our standard of review accordingly. See *Dodge City Implement, Inc. v. Board of Barber County Comm'rs*, 288 Kan. 619, 624, 205 P.3d 1265 (2009) (motion to dismiss that was treated as motion for summary judgment received summary judgment standard of review). We exercise unlimited review in determining whether the district court properly granted a motion for judgment on the pleadings. *Koss Construction v. Caterpillar, Inc.*, 25 Kan. App. 2d 200, 201, 960 P.2d 255, *rev. denied* 265 Kan. 885 (1998). Judgment on the pleadings should be granted when, based on the admitted facts, the plaintiff has no cause of action. 25 Kan. App. 2d at 200-01.

A. *The District Court Correctly Granted Judgment to Louisburg on the Albrights' Fraud-in-the-Inducement Claim Based on the Economic-Loss Doctrine.*

The district court correctly relied on the economic-loss doctrine to grant Louisburg judgment on the pleadings, because the Albrights' fraud-in-the-inducement claim merely duplicates their claim for breach of contract. The economic-loss doctrine prohibits the assertion of such duplicative claims to prevent the unnecessary complexity that would result from allowing every breach of contract to give rise to a tort. A review of the economic-loss doctrine's history and purposes makes this conclusion evident.

The economic-loss doctrine originated in products-liability law, preventing purchasers from suing in tort where the damages claimed were purely economic—stemming from product-repair costs, product-replacement costs, inadequate product value, or lost profits resulting from product defects. *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988, 22 Cal. Rptr. 3d 352, 102 P.3d 268 (2004). To recover in tort, the product purchaser with merely disappointed economic expectations had to demonstrate some "harm above and beyond a broken contractual promise." *Robinson Helicopter*, 34 Cal. 4th at 988. The doctrine initially aimed to prevent contract law from dissolving into tort law by drawing a distinction between commercial transactions, where contract

law protects economic expectations, and consumer transactions, where tort law remedies physical injuries to individual consumers. *Robinson Helicopter*, 34 Cal. 4th at 988; See *Prendiville v. Contemporary Homes, Inc.*, 32 Kan. App. 2d 435, 438-45, 83 P.3d 1257, *rev. denied* 278 Kan. 847 (2004).

The doctrine has since expanded to serve as the dividing line between contract and the broader array of tort claims, including claims for negligence and strict liability. *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 874-75 (9th Cir. 2007). Three policies seem to be driving the expansion of the doctrine: (1) protecting parties' expectations with respect to their bargained-for limited liability; (2) encouraging the buyer to insure against the risk of economic loss; and (3) preventing "unnecessary complexity" resulting from the assertion of tort claims that merely duplicate breach-of-contract claims. *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 865-66 (7th Cir. 1999); see also *Giles*, 494 F.3d at 876-77 (collecting cases applying the third policy). This court has recognized similar policies in its own applications of the economic-loss doctrine. See *Prendiville*, 32 Kan. App. 2d at 444. This court has also held that these policies remain applicable when the purchaser is an individual consumer, as opposed to a sophisticated commercial purchaser. *Jordan v. Case Corp.*, 26 Kan. App. 2d 742, 744, 993 P.2d 650 (1999), *rev. denied* 269 Kan. 933 (2000).

In the context of claims for fraud in the inducement, the economic-loss doctrine has produced exceptional inconsistency. On one hand, a majority of states have held that the economic-loss doctrine never applies to fraud-in-the-inducement claims. See Anzivino, *The Fraud in the Inducement Exception to the Economic Loss Doctrine*, 90 Marq. L. Rev. 921, 931-32 & nn. 66-67 (2007) (listing the states). These states seem motivated by two concerns. First, when one party lies about its intention to perform the contract, this party has not bargained fairly, and its contractual expectation of limited liability is not worthy of protection. *E.g.*, *Robinson Helicopter*, 34 Cal. 4th at 990-92. In other words, the aggrieved party's recovery should not be limited by contract terms that were not fairly bargained for. As one scholar put it, the economic-loss doctrine should not allow parties to accomplish what they have

traditionally not been able to do by contract: limit their liability for fraud. See Anzivino, 90 Marq. L. Rev. at 940-41. Second, the majority approach recognizes that fraudulent behavior is socially undesirable, and thus it is appropriate to punish and deter such conduct with the imposition of tort remedies. *E.g., Robinson Helicopter*, 34 Cal. 4th at 992; *cf. Formosa Plastics v. Presidio Engineers*, 960 S.W.2d 41, 46-47 (Tex. 1998) (allowing fraud-in-the-inducement claim in contract scenario, mentioning the existence of exemplary damages in distinguishing between contract and tort remedies); *Abi Najm v. Concord Condominium, LLC*, 280 Va. 350, 362-64, 699 S.E.2d 483 (2010) (same).

On the other hand, a minority of states have applied the economic-loss doctrine to fraud-in-the-inducement claims that merely attempt to recover damages resulting from unfulfilled contractual promises. See, *e.g., Hotels of Key Largo, Inc. v. RHI Hotels*, 694 So. 2d 74, 78 (Fla. Dist. App. 1997); *Huron Tool v. Precision Consulting Servs.*, 209 Mich. App. 365, 370-74, 532 N.W.2d 541 (1995); *Wickenhauser v. Lehtinen*, 734 N.W.2d 855, 868-69 (Wis. 2007); see also Anzivino, 90 Marq. L. Rev. 921, 933 n.74 (listing other states likely to adopt the minority approach). Carving out this group of cases makes sense because when a party is merely suing to recover the benefit of its contractual bargain, there is no inherent unfairness in limiting that party to a breach-of-contract claim. See *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 679-680 (3d Cir. 2002) (siding with the minority approach, concluding that it was unclear "why contract remedies are inadequate to provide redress when the alleged misrepresentation relates to the quality or characteristics of the goods sold"). But the minority approach recognizes that the economic-loss doctrine should not apply to all fraud-in-the-inducement claims: when the fraudulent inducement concerns a matter that was not later embodied in the contract terms, a breach of contract suit offers no redress to the aggrieved party, and thus courts must resort to tort law as the only means of offering relief. See *Kaloti Enterprises v. Kellogg Sales Co.*, 699 N.W.2d 205, 220 (Wis. 2005); *Werwinski*, 286 F.3d at 677-78 (providing examples of when this might happen).

The minority's approach ·is logical. The majority's concern that a party's recovery might be limited by fraudulently induced contract terms does not come into play .where the complaining party is asking for the same relief that would be granted under a contract action. See *Great Florida Bank v. Countrywide Home Loans, Inc.*, 2010 WL 4024892, at *4 (S.D. Fla. 2010) (discussing the split in authority, noting that the minority approach. offers "substantial practical appeal, particularly where the actual damages resulting from the alleged misrepresentations are purely economic and identical to those suffered on account of the contractual breach"). Applying the economic-loss doctrine to prohibit these duplicative tort claims serves the economic-loss doctrine's purpose of preventing unnecessary complexity in the law, as there is a real risk that allowing such claims would turn every breach of contract into a tort. See *Multifamily Captive Gr. v. Assurance Risk Managers*, 629 F. Supp. 2d 1135, 1146 (E.D. Cal. 2009); *Werwinski*, 286 F.3d at 678. The Kansas Supreme Court has previously recognized the importance of this policy, warning against the "danger" of allowing claims that attempt to turn every breach of contract into a tort. See *Gerhardt v. Harris*, 261 Kan. 1007, 1021, 934 P.2d 976 (1997). Maintaining this distinction also seems consistent with the Restatement of Torts, which suggests that fraud-in-the-inducement claims will usually be an *alternative* means of recovering breach of contract damages when the contract is unenforceable. Restatement (Second) of Torts § 530, comment c (1976).

In this case, the Albrights' fraud-in-the-inducement claim against Louisburg Building merely duplicates their claim for breach of contract. The Albrights alleged that they were induced to enter the contract by Louisburg's fraudulent misrepresentations relating to their ability to build the house properly and for a certain price and that these misrepresentations damaged them in the form of "hundreds of thousands in additional costs to construct their house." In other words, Louisburg Building's fraud deprived the Albrights of the benefit of their contractual bargain. The Albrights have not argued that the terms of their contract have unfairly limited them from recovering some form of damage—they are simply trying to enforce contract terms through a fraud claim. Given that

the alleged fraud did not cause any damage that the Albrights cannot recover through a breach of contract claim, one might be inclined to take the minority approach, and use the economic-loss doctrine to prohibit the Albrights' claim.

We have yet to address, however, the majority's second concern, regarding punishment and deterrence of fraudulent conduct. Even if a party's injuries are sufficiently redressed by a breach of contract claim, it is not clear why that party should not also be able to recover punitive damages (recoverable in fraud cases) in order to punish the fraud and deter the other party from committing fraud in the future. Courts adopting the minority approach have not addressed this specific point. But in discussing the economic-loss doctrine's application to intentional fraud, Judge Richard Posner has suggested that imposing punitive damages is not the most efficient method of dealing with fraudulent conduct: "It is true that, in principle, the cheapest way to prevent fraud is to punish the fraudfeasor; but in practice, owing to the ever-present possibility of legal error, the really cheapest way in some cases may be to place a burden of taking precautions on the potential victim." *All-Tech Telecom*, 174 F.3d at 866. Judge Posner qualified his statements, however, noting that if the economic-loss doctrine was stretched too far in barring tort claims, the resulting purchaser-beware policy would carry its own inefficiencies because "prospective parties to contracts will be able to obtain legal protection against fraud only by insisting that the other party to the contract reduce all representations to writing, and so there will be additional contractual negotiations, contracts will be longer, and, in short, transaction costs will be higher." *All-Tech Telecom*, 174 F.3d at 867.

Beyond identifying these competing concerns, Judge Posner did not offer any firm guidance in striking a balance between them because he was able to dispose of the case before his court on other grounds. *All-Tech Telecom*, 174 F.3d at 867. But his comments nevertheless bear relevance to the group of cases the minority approach has attempted to carve out. Judge Posner's comments imply that, where one party has successfully protected itself by including the other party's fraudulent representations in the written contract, the fraud has been prevented from causing any

additional damage beyond a breach of contract. In this situation, there is no need to deter the tortfeasor through punishment because the "victim" is protected by his or her breach of contract claim.

The Kansas Supreme Court has previously taken a similar viewpoint with respect to imposing punitive damages, stating that the "exception to the rule of unavailability of punitive damages in breach of contract actions is recognized when some independent tort or wrong results in *additional* injury which justifies the assessment of punitive damages by way of punishment of the wrongdoer." *Guarantee Abstract & Title Co. v. Interstate Fire and Cas. Co.*, 232 Kan. 76, 78, 652 P.2d 665 (1982). (Emphasis added.) But this case is in tension with a later precedent, *Equitable Life Leasing Corp. v. Abbick*, 243 Kan. 513, 516, 757 P.2d 304 (1988), where the Kansas Supreme Court held that punitive damages were available for a fraudulent-inducement claim despite the fact that no actual damages were awarded for the fraud because such damages would have been duplicative of the plaintiff's breach-of-contract damages. One year later, in *Heller v. Martin*, this court reaffirmed the idea that punitive damages are not recoverable in the breach-of-contract scenario unless an independent tort causes additional injury, yet this court also hinted that if the claim had been for fraudulent inducement, punitive damages may have been available. 14 Kan. App. 2d 48, 54-55, 782 P.2d 1241 (1989).

Based on *Guarantee Abstract*, *Heller*, and Judge Posner's analysis, we see no persuasive reason to impose punitive damages against a defendant who has failed to fulfill a contractual bargain when a claimed fraud has not caused any additional injury beyond the breach-of-contract damages. We see no reason to treat a fraudulent inducement that does not cause additional damage any differently. We do not consider *Equitable Life* controlling here: our Supreme Court didn't consider the economic-loss doctrine in that case. We conclude that the district court properly applied the economic-loss doctrine to preclude the Albrights' fraud-in-the-inducement claim, which sought only to turn a standard breach-of-contract claim into a tort claim.

B. *The Albrights' Fraud-in-the-Inducement Claim Against Williams Is Barred by the Statute of Limitations.*

The Albrights also asserted a fraud-in-the-inducement claim against Williams, but this claim is barred by the statute of limitations. Common-law-fraud claims have a 2-year statute of limitations, running from the discovery of the fraud. K.S.A. 60-513(a). The key facts now asserted by the Albrights in support of their fraud-in-the-inducement claim—that Williams, on behalf of Louisburg Building, made misrepresentations to the Albrights—was alleged in support of the Albrights' original fraud claims. This shows that, at the latest, the Albrights had knowledge of their fraud-in-the-inducement claim against Williams on January 14, 2005, when they filed their original counterclaim. The Albrights did not add Williams to the lawsuit until they filed their second amended counterclaim on April 18, 2007, more than 2 years later. Even if arising out of the same transaction, amendments adding new parties do not relate back to earlier pleadings against different parties. *Schmidt v. Nauman*, 202 Kan. 131, 132-33, 446 P.2d 828 (1968). The Albrights' fraud-in-the-inducement claim against Williams is barred by the statute of limitations.

ISSUES RAISED BY CROSS-APPELLANT LOUISBURG BUILDING

VII. *The Trial Court Did Not Err in Finding that Louisburg Building's Failure to Notify the Albrights About Cost Overruns Was Unconscionable Under the KCPA.*

The trial court found that Louisburg Building's failure to document change orders resulting in cost overruns was "unconscionable pursuant to K.S.A. 50-627 of the KCPA." Specifically, the court found that Louisburg Building was aware of the Albrights' budget concerns and that Louisburg Building, as general contractor, was "in the superior position of knowing when the Albrights' choices of fixtures and other items exceeded the costs associated with the original plans." Since construction proceeded from January to September 2004 without any written indication of cost overruns that were occurring, the court found Louisburg Building's conduct to be unconscionable. The trial court determined that

Louisburg Building committed nine violations, finding that Louisburg Building had failed to inform the Albrights of substantial cost overruns in nine different budget categories.

Louisburg Building does not challenge the district court's findings of fact with regard to this issue, but it argues that, as a legal matter, the conclusion that the construction contract was unconscionable was prohibited by the court's own finding that attorneys represented both parties' interests during the contract's negotiation. Louisburg Building contends that the district court abused its discretion by imposing upon Louisburg Building an industry standard regarding change orders that was contrary to the "clear and unambiguous terms of the contract." Louisburg Building argues that section 10 of the contract—regarding change orders requested by the Albrights—did not require Louisburg Building to advise the Albrights of the financial consequences of change orders. Rather, the contract merely required Louisburg Building to keep full and detailed records and to make those records available to the Albrights. Louisburg Building argues it fulfilled this contractual duty because it provided detailed records to the Albrights' construction lender, and the Albrights received the records at each draw request. Louisburg Building adds that the trial court did not make any findings of fact that could qualify as unconscionable under either the KCPA's statutory examples or any Kansas appellate opinions discussing the KCPA.

As a preliminary matter, it seems that part of Louisburg Building's argument on appeal regarding this issue focuses on whether the district court erred in interpreting the contract and finding Louisburg Building in breach of that contract. Given Louisburg Building's argument heading ("The Trial Court Erred in Finding the Contract Was Unconscionable . . . .") and the fact that most of Louisburg Building's argument focuses on unconscionability, we conclude that Louisburg Building did not intend to raise these contract issues independently. Issues that are raised only incidentally and not fully argued in appellate briefs are deemed abandoned, and thus the issues of contractual interpretation and breach will not be addressed here. See *Cooke v. Gillespie*, 285 Kan. 748, 758, 176 P.3d 144 (2008).

As we have previously explained in greater detail, the determination of unconscionable conduct under the KCPA is a question of law over which this court theoretically has unlimited review, but in which the decision is often best left to the sound discretion of the district court because of the difficulty of describing an absolute boundary to the concept of unconscionability. *State ex rel. Stovall v. DVM Enterprises, Inc.*, 275 Kan. 243, 249, 62 P.3d 653 (2003).

The district court's unconscionability finding was based on Louisburg Building's behavior in failing to notify the Albrights of cost overruns, not the terms of the contract itself. Therefore, Louisburg Building's argument relating to negotiation by counsel is irrelevant. Moreover, as the Albrights note, the district court did not find, nor did the evidence support a finding, that the Albrights ever made a change-order request. Thus, the district court's finding of unconscionability did not contravene the terms of the contract regarding change orders.

Louisburg Building is right when it suggests that its conduct does not fit neatly within the circumstances explicitly set out in the statute. Nor does it fit exactly with a previously published appellate case. But the examples in this statute are just that—examples. Even if Louisburg Building's conduct does not perfectly align with the statutory examples, it seems to fall squarely within the traditional hallmarks of unconscionability: deceptive conduct coupled with an imbalance of power between the parties. When a party is under a duty to disclose certain information, the omission of that information rises to the level of deception. *Williamson v. Amrani*, 283 Kan. 227, 246, 152 P.3d 60 (2007) (interpreting the KCPA's prohibition on deceptive acts under K.S.A. 50-626). The duty to disclose can arise from the relationship between the parties, trade customs, or any objective circumstances that lead one party to reasonably expect disclosure of the omitted facts. *Williamson*, 283 Kan. at 246. In contrast to the situation where Louisburg Building failed to notify the Albrights that it was using Carson Group, here, the court found industry custom required Louisburg Building to notify the Albrights when costs were exceeding budget. Therefore, Louisburg Building's failure rises to the level of deception for purposes of determining unconscionability.

Turning to the second characteristic of unconscionability, there was an imbalance of power between the parties with regard to the budget issue. As the district court noted, Louisburg Building was in the best position to determine when costs were exceeding budget—the Albrights really had no way of monitoring Louisburg Building to ensure that their budget was not being exhausted as Louisburg Building was in charge of hiring and supervising all of the subcontractors. It is true that Louisburg Building was required to submit itemized statements to receive draw requests from the construction account, and the Albrights could have accessed these statements and crunched the numbers to make at least an educated guess about whether the budget was holding as projected. But these draw requests were made less than once a month, and the Albrights really did not have the same access to budget information that Louisburg Building did.

Because Louisburg Building's conduct exhibited elements of both deceptive conduct and abuse of the imbalance of power between the parties, the district court did not err in finding this conduct unconscionable under the KCPA.

VIII. *The Trial Court Did Not Err by Awarding the Albrights Both Damages and Civil Penalties Because Damages Were Not Awarded Pursuant to the KCPA.*

The district court found that Louisburg Building committed nine KCPA violations and awarded the Albrights $90,000 in civil penalties. The court did not award compensatory damages for these KCPA violations as the Albrights had already received compensatory damages for their breach-of-contract claim.

Louisburg Building argues that the district court erred by awarding the Albrights both contract damages and a civil penalty under the KCPA because, according to K.S.A. 50-634(b), a complainant under the KCPA must choose between damages or a civil penalty, whichever is greater. Essentially, Louisburg Building argues that the KCPA prohibits the award of both damages and penalties for the same culpable conduct, even if that conduct justifies damages under a theory of liability wholly independent from the KCPA. We

have unlimited review over this question of statutory interpretation. *Unruh*, 289 Kan. at 1193.

In this case, the KCPA limits the consumer's recovery under the statute to a choice between damages and civil penalties: "A consumer who is aggrieved by a violation of this act may recover, but not in a class action, damages or a civil penalty as provided in subsection (a) of K.S.A. 50-636 and amendments thereto, whichever is greater." K.S.A. 50-634(b). The KCPA also states that the act should be construed liberally "to protect consumers from suppliers who commit deceptive and unconscionable practices." K.S.A. 50-623(b). And another provision of the KCPA provides: "Nothing in this act shall in any way limit or affect the rights or remedies which are otherwise available to a consumer . . . under this or any other law statutory or otherwise." K.S.A. 50-646.

Construing these three provisions in harmony, it seems unlikely that the legislature intended the KCPA to limit the recovery of damages under common-law theories of liability. A more sound interpretation is that the KCPA creates a statutory action for damages that is independent of any common-law claims, and the plaintiff consumer must choose between a civil penalty and damages under the KCPA, not a civil penalty and damages generally. Indeed, as the Albrights point out, the Kansas Supreme Court has specifically stated that a plaintiff's common-law recovery is unaffected by the KCPA: "[T]he legislature, in a 1985 amendment, clearly provided that a plaintiff who decides to proceed under the KCPA does not forfeit any other common-law rights." *Equitable Life Leasing Corp.*, 243 Kan. at 515 (citing K.S.A. 1987 Supp. 50-646). We should construe the provisions of a statute so that they are " 'consistent, harmonious and sensible.' " *Southwestern Bell Tel. Co. v. Beachner Constr. Co.*, 289 Kan. 1262, 1270, 221 P.3d 588 (2009). In our view, construing the KCPA's damage-election provision to require that a KCPA plaintiff must forego damages under all common-law actions if he or she is to proceed under the KCPA would negate the liberal-construction provision in K.S.A. 50-623(b) and the provision in K.S.A. 50-646 that the KCPA does not affect remedies otherwise available.

Therefore, the district court did not err in awarding the Albrights both breach of contract damages and a civil penalty under the KCPA.

For the reasons set out in this opinion, the district court's award of damages for breach of contract is vacated and the case is remanded for determination of the correct amount of damages. In all other respects, the judgment of the district court is affirmed.