NOT DESIGNATED FOR PUBLICATION

No. 112,375

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ALFORD RANCHES, LLC,
*Appellee*,

v.

TGC INDUSTRIES, INC.,
d/b/a TIDELANDS GEOPHYSICAL COMPANY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Kiowa District Court; VAN Z. HAMPTON, judge. Opinion filed December 31, 2015. Reversed.

*Daniel H. Diepenbrock*, of Liberal, for appellant.

*Thomas V. Black* and *John V. Black*, of Black's Law Office, P.A., of Pratt, for appellee.

Before POWELL, P.J., PIERRON and LEBEN, JJ.

PIERRON, J.: This appeal is concerned with a seismic survey performed on surface land owned by Anthony Alford and Alford Ranches, LLC (collectively Alford). Alford purchased the surface rights only to the land in 2007 for the purpose of hunting and cattle grazing. TGT Petroleum (TGT) owned the mineral rights to the same land and contracted with TGC Industries, Inc. d/b/a Tidelands Geophysical Company (TGC) to perform the seismic survey. TGC performed the survey in March 2010. When Alford returned to the land, he noticed ruts on the land left over from the survey. TGC offered Alford the industry standard of $5 per acre in damages, but Alford rejected it. Instead, Alford eventually filed a suit in negligence against TGC and the case went to trial.

1

Alford pled this case as a general negligence case, as opposed to a professional negligence case. Alford did not present expert testimony explaining industry standards for seismic surveys or regarding the industry standard ruts left on land after a survey was performed. Alford argued the land was too wet when TGC performed the survey and TGC should have used lighter equipment. TGC presented evidence that it performed the survey on the land in accordance with industry standards. The fight at the district court centered on the damages calculation. Alford presented evidence from a dirt contractor and farmer that it would cost $1 per foot to remediate the land and that Alford's caretaker had fixed the ruts on the roads for $70 per foot. TGC objected to the figure and presented evidence from a soil conservationist that Alford's land was not legally damaged based on the intended uses—hunting and cattle grazing. The jury awarded Alford Ranches $88,000 in damages.

On appeal, TGC raises five issues, which can be summarized as a challenge to the sufficiency of the evidence that TGC was negligent when it performed the seismic survey on Alford's land; and the admission of evidence. TGC argues the district court abused its discretion when it admitted expert testimony, photographs, and rebuttal testimony.

Alford responds that there was sufficient evidence of negligence and asks us to hold TGC strictly liable. Alford also claims the district court properly admitted deposition testimony, photographs, and rebuttal testimony. Finally, Alford claims TGC did not properly preserve its challenge to the admission of deposition testimony.

TGC filed a reply arguing against the application of strict liability and claiming it had properly preserved the evidentiary issue.

A review of the record indicates that Alford did not present any evidence that TGC acted unreasonably when it surveyed the land or that TGC failed to do something a

2

reasonable surveyor would have done. As such, there is an absence of evidence that TGC breached the duty it owed Alford. Even if there was evidence of a breach, there is no evidence establishing how or why the industry standard damages of $5 per acre that TGC offered Alford was insufficient. The expert testimony that it would cost $1 per foot to remediate the ruts is too speculative in nature and should not have been admitted.

TGC argues Alford presented no evidence that TGC owed a duty to Alford or that TGC breached that duty. Therefore, TGC claims there was insufficient evidence to support the jury's finding of fault and award of damages. Viewing the evidence in the light most favorable to Alford, was there sufficient evidence to support the jury verdict? We find there was not.

Alford did not present expert testimony from an outside seismic surveying expert. Instead, Alford Ranches argued at trial that the ground was too wet to perform the survey. Alford also argued TGC should have used a lighter vibrator truck because Alford thought the land was too wet 2 months prior to the survey; Alford wanted TGC to use vibrator vehicle with tracks instead of tires; and Alford was unhappy with the ruts left on his ground. But TGC used the industry standard vibrator truck and followed the rule of thumb regarding drying time for precipitation. Alford presented no evidence that TGC acted unreasonably or failed to do something a reasonable seismic survey company would have done under the circumstances. Alford's witness testified the ruts left on the land were normal, but that the ruts made hunting and cattle grazing inconvenient. There is also evidence that TGC did own other seismic equipment, but nothing to suggest the equipment could have performed the same survey or have resulted in smaller ruts. The evidence suggests that TGC performed the survey in a reasonable manner but left ruts on the land. However, there is no evidence that the ruts were left as a result of TGC's negligence.

3

Roy Burson, TGC employee, initially contacted Alford about the survey. Alford testified at trial that Burson had contacted him in March 2010, to let him know TGC would be performing a survey on the property. Alford said he told Burson it was currently raining on the land and he did not want the survey to take place while the ground was wet. Alford testified he asked if the survey could be postponed and Burson refused to delay the survey. Burson last worked for TGC on January 29, 2010, and died on February 18, 2010.

On December 18, 2009, Burson had mailed Alford a permit requesting permission to perform the survey on his land. On January 7, 2010, TGC employee, Victoria Yohn, overheard a phone conversation between Burson and Alford. She testified she heard Burson tell Alford that TGC had a right to be on the property and would cut locks if Alford put them up. That same day, Yohn faxed a cover letter and the permit letter to an attorney after Burson got off the phone with Alford. Only the cover letter is included in the record on appeal. Alford never signed the permit.

A TGC crew went to look at the property sometime between January 25, 2010, and February 5, 2010. However, the seismic survey did not occur until March 2010. TGC arrived on Alford's property on March 10, 2010. Yohn had obtained weather and precipitation information from the Dodge City Airport for the months of February and March 2010. The airport—the closest location reported on the web site—was approximately 50 miles from the Alford property. The records showed the following precipitation:  9.5 inches of snow fell between February 2-22, 2010, but had all melted by February 25, 2010; .71 inches of precipitation between February 2-21, 2010; .03 inches of precipitation on March 11, 2010; .39 inches of precipitation on March 8, 2010; .01 inches on March 9, 2010.

TGC employee Gary Goodlander testified about the snowfall in early February 2010. He acknowledged he had not actually gone to the property before the survey to see

4

if the snow was gone. Goodlander said the weather reports and 50-degree weather indicated the snow would have melted prior to the survey. Goodlander said there was nothing in the weather reports to suggest that TGC should not have performed the survey of the land on March 13 through 16, 2010.

The crew laid receivers on March 10 and 11, 2010. They drove four-wheel drive ATVs. The crew was unable to work on March 12, 2010, because the winds were too high, which meant constant winds at 25 miles per hour or greater. The vibrator trucks were on Alford's land from March 13 through 16, 2010. The seismic survey occurred on March 13 through 16, 2010. TGC used Hemi-60 vibrator trucks to perform the seismic survey. Goodlander said the trucks traveled a maximum of 127,500 feet over Alford's land, but that did not mean TGC had left the same number of ruts.

When Alford returned to the property sometime after the survey had been performed, he found ruts all over the land.

Jeremy Butler, a field supervisor for TGT, testified for Alford about the ruts he saw on Alford's land. TGT owned the mineral rights and had requested the survey. Butler had been on the land before and after the survey. Butler saw how big and how deep the ruts were. He had driven across the land in a pickup truck and encountered the ruts. He described the ruts as "tracks . . . that you would expect from the equipment."

In June 2010, Alford hired Earl Hicks to be the caretaker of his land. Hicks was paid a salary. Alford asked Hicks to measure and photograph the ruts on the land. Hicks found 14 paths of ruts, each with two ruts. Hicks said he fixed 300 feet of ruts that crossed the roads on the lands using a disk that he dragged back and forth across the roads. He did not photograph the ruts on the road prior to fixing them. Alford did not pay Hicks specifically for the task of fixing the ruts; instead, Alford just paid Hicks a regular salary. Hicks estimated the cost to be $22,000 to fix the ruts based on the time he spent

5

fixing them—150 hours at a rate of $20/hour for equipment costs. This was approximately $70 per foot. The remaining ruts were still present at the time of trial.

In the summer of 2010, Alford contacted TGC to ask why he had not received his payment yet. Based on his acreage, Alford was entitled to $6,100. A check was sent on October 5, 2010, but Alford never cashed the check.

Alford sought to admit exhibits N and 0. Alford said exhibit N was a photo of a vehicle like what he thought TGC had used on his land. He did not explain where the photo came from. Alford said exhibit O, a photo of a large vehicle with tracks instead of tires was what he wished TGC had used. Alford did not explain where the photo came from or verify that it was a vibrator truck. Alford said the exhibits were for demonstrative purposes only. The district court admitted the photos over TGC's objection to the lack of foundation.

Hicks had leased the Alford land to Dayle Heft, a neighbor, for cattle grazing. Hicks said the ruts did not affect the ability to lease the land out for cattle grazing or affect the deer population for hunting. Hicks said Heft provided in-kind services such as building a fence and a solar panel on a well in exchange for letting his cattle graze on the land. Heft bore the cost of the supplies for the projects instead of paying cash rent. Hicks felt the ruts made it hard for handling the cattle because they made it difficult to drive across the land and made deer hunting more difficult.

Hicks also asked Heft to look at the ruts. Heft was deposed on April 18, 2013. Alford did not ask Heft any questions at his deposition. Heft died the week prior to trial. Alford was prepared to read Heft's deposition testimony at trial. However, before the start of trial, TGC filed a motion to strike Heft's testimony, claiming: Heft was "not an expert in this field" and (2) it would be highly prejudicial to allow Heft to give his "Oh, a dollar a foot" estimate. The motion is not included in the record on appeal, but a transcript of

the argument is. The district court had not read the deposition testimony prior to hearing argument on the motion to strike. Alford argued that "the dollar a foot [Heft] said was based on his experience." Alford argued Heft had considered the amount of fuel, the cost of a tractor, the cost of a driver, and the labor.

When Alford asked to read Heft's deposition into the record, TGC indicated it had no objection. However, prior to the reading of the portion of Heft's testimony about the $1 per foot estimate, TGC renewed its objection to Heft's lack of foundation and qualifications. The district court overruled the objection.

Heft's testimony revealed that he owned property adjacent to Alford's property and was familiar with it. Heft was a farmer and a contractor who did a lot of work as a dirt excavator. When Heft went out to Alford's land, he recognized the ruts as seismograph truck tracks because he had "those same tracks on my properties, too, I mean similar" from surveys being performed on his land over the years. Heft stated he "[h]ad a good idea" of what to expect of the ruts. He spent about an hour exploring the land with Hicks. He measured some of the ruts.

Heft's testimony indicated he had wanted to create a tool to remediate the ruts. The tool he created was a "big ox ripper with a special shoe on the bottom." Heft tried the tool on his own land, but it did not work due to the dryness of the soil. He never tried the tool again. The area had been experiencing drought conditions, but Heft felt it would work once the undersoil had more moisture. Heft also provided a written estimate to remediate the ruts.

Heft estimated it would cost a minimum of $1 per foot to remediate the ruts. His written estimate included his opinion that the ruts interfered with the use of range land for pasture. He testified he figured in the time, fuel, and labor, but his report did not mention this. However, he was unsure whether fuel and labor were actually included in the

7

estimate and did not know a cost for the labor and fuel. He had no calculations and had not referred to any publications when calculating the cost. The district court admitted Heft's written estimate over TGC's objection that the document was cumulative.

At trial, Alford questioned Goodlander about other equipment TGC had and introduced photos from TGC's web site of the different pieces of equipment. TGC objected to the admission of exhibits Q, R, S, T, and U. TGC argued the exhibits did not further the theory of Alford's case. The photos were admitted into evidence. Goodlander said in addition to the Hemi-60, TGC had other models of vibrator trucks, including:  the Hemi-50, "which is just the same version as the 60, but about 10 thousand pounds lighter"; some that are mounted on trucks—the "old version" of a vibrator truck; the Enviro-Vibe and shothole rigs; and a "10 to 300 hertz vibrator." Goodlander explained that the Hemi-60 and Hemi-50 have very similar tires and the same chassis.

The exhibits provided the following information about the vibrator trucks:  Hemi-60—"This reliable and tested seismic vehicle is just one of the seismic source vehicles that [TGC] has in its' fleet." It is the "most advanced seismic source system that offers . . . the deepest seismic surveys"; Hemi-50—[t]he Hemi-50 buggy mounted vibrator is an all-terrain vehicle that has been a mainstay of many vibroseis projects. It is well suited for most any project." It is an "advanced seismic source system," and its "50,000 pound output offers . . . deeper seismic surveys"; and Enviro Vibes—"powerful 'mini-buggies' specifically designed for working in sensitive areas where size and/or sound could restrict access." An Enviro Vibe is a "low impact vibrator system that is optimized for operation in environmentally restricted or populated areas. . . . [It] is an excellent choice for environmentally sensitive, high resolution surveys."

Alford also showed Goodlander exhibit O. Goodlander said he had never seen a truck like exhibit O used on a surface source. In fact, he thought the vehicle was not even a vibrator truck.

At the close of Alford's case, TGC orally moved for judgment as a matter of law. TGC argued that "no credible, no worthy evidence has been presented to substantiate a claim for damages." TGC claimed the only evidence that Alford had presented about damages to the land was the testimony of written report by Heft. TGC challenged the credibility of Heft's alleged damages because Heft had never made a tool before like the one he had made here, the tool had not worked, and he could not really explain how he had come up with the estimate of $1 per foot. TGC also argued that Alford had not presented any evidence of a legal damage to the land since it had been purchased for hunting and grazing and the only complaint was inconvenience. Alford argued that Hicks' and Heft's testimony substantiated a claim for damages.

The district court affirmed its previous ruling that Heft was qualified as an expert to give his opinion based on his years of experience and skill involved in excavating. The judge determined Heft had stated "it would cost at least a minimum of a dollar a foot to repair the ruts. And, I think that's a matter for the jury." The court acknowledged that Heft's opinion left "much room for argument," but it was up to the jury to interpret and apply that opinion. The court denied TGC's motion finding the testimony clearly showed that the ruts were not on the land prior to the seismic exploration and therefore the jury "could find that the damages were shown from the testimony." The court identified the damages questions as "whether or not the land was altered, and as a result of that altering it would be considered damaged if it cost to remedy it." The court treated this case like one of strict liability. In a negligence action, there is only liability for the altering of the land if TGC acted unreasonable in some way, not merely because it cost to remedy the ruts.

Lonnie Fehrenbacher testified as an expert for TGC. He had spent over 31 years as a soil conservationist and was retired from the United States Department of Agriculture (USDA). He was working part time for the Kansas Department of Wildlife Parks and

9

Tourism. He did primarily the same job for both departments; writing grazing plans, assessing damages regardless of cause, and creating burn plans.

TGC asked Fehrenbacher to visit Alford's property to inspect for possible damage. He visited the property in March 2013 to observe the ruts and check the soil. He determined the soil was a "Pratt loamy fine sand." Fehrenbacher testified that Pratt loamy fine sand lacked structure and could not be compacted—or damaged—by the ruts. He found that vegetation was growing in the ruts, which was good because water could collect there and bring additional moisture to vegetation. He found nothing about the ruts that would negatively affect the wildlife population or grazing cattle, but he did acknowledge that someone driving an ATV across the land would have to be careful of the ruts. He did not believe remediation was necessary since the land was used for wildlife, hunting, and grazing cattle.

Fehrenbacher provided a written report of his findings, which did not include a cost to remediate. In his report, Fehrenbacher indicated there was no evidence the vegetation had been damaged, remediation was not necessary, and that the ruts did not affect the use of land for grazing and wildlife purposes.

TGC also used Fehrenbacher to provide the foundation for the admission of two documents, the USDA Custom Rates from 2009 and the Kansas State University 2013 Projected Custom Rates for Kansas. When Fehrenbacher had worked for the USDA, he had helped to determine the cost to remediate or work farm and ranchland. One of his responsibilities with the USDA had been to remediate damages to wetlands. The USDA Custom Rates from 2009 indicated the custom rate for disking was an average of $9.06 an acre. The 2013 Projected Rate for disking was $9.87 an acre.

Alford presented the testimony of Kevin Heft and Steve Heft in rebuttal. Kevin testified he had spent 30 years in the cattle business and was familiar with rent prices for

pasture land, but he was not a certified appraiser and testified he was not expressing his opinion as to the fair market of the land. TGC objected to his testimony as improper rebuttal. TGC argued Kevin was not actually rebutting anything in his testimony, it was irrelevant to Alford's measure of damages, and it lacked of foundation. The court overruled all three objections. Alford argued Kevin's testimony rebutted Fehrenbacher's testimony that the land did not need remediating. Kevin testified the ruts made it inconvenient for running cattle. Alford argued he had a right to bring in evidence to rebut TGC's evidence that there were no damages because the land was good for cattle to graze. Kevin said he currently rented Alford's pasture at $10 per acre, but other pastures rented for $12 to $14 per acre. He said the ruts made it less valuable.

Steve testified he worked in the construction business and had a lot of experience with dirt moving and excavation. TGC again objected that Steve was not actually rebutting anything and he had not been identified as an expert but was offering testimony about the cost of remediating the land. Steve felt the land needed to be remediated. He also felt his father's estimate had not been out of line. Steve said it would take a yard of dirt for every 10 feet of ruts, and hauling material would cost $10 a yard, not including reseeding. He said it would cost at least $1.75 a foot if he hauled in dirt. He also felt his father's tool would have worked if the soil had had enough moisture. He had seen his father's plans for the tool and had seen the actual tool.

The district court instructed the jury, and the parties made closing arguments. The jury determined TGC was at fault and awarded Alford $88,000 in damages.

TGC filed a motion for judgment as a matter of law or for a new trial. The motion cannot be found in the record, but a transcript of the hearing is. TGC contended there was no evidence that its actions lacked ordinary care. TGC claimed Alford had failed to present any evidence of a standard of care. TGC noted Alford's testimony about the land being too wet was from a time long before TGC performed the survey. Butler said the

11

ruts were normal, and there was no evidence that a seismic company using ordinary care would have used any of the smaller equipment. TGC again challenged Heft being qualified as an expert and his $1 per foot estimate for remediation.

TGC also argued that the district court had erroneously allowed the rebuttal testimony of Heft's sons. Steve's testimony about Heft's tool supports TGC's theory that Steve's theory of remediation was not proper. Kevin's testimony was improper because Alford's theory of damages had been temporary damages and, therefore, the measure of damages would be repair, but Kevin's testimony was about diminishing the value of the land due to the ruts. TGC argued the district court erroneously admitted the photographs of other seismic equipment. TGC claimed an improper foundation had been laid, and therefore it was prejudicial to TGC to admit those photographs. Finally, TGC argued the cumulative effect of the errors warranted a new trial or judgment notwithstanding the verdict.

In response, Alford suggested the district court had a chance to rule on all of these issues at trial and correctly denied all of TGC's motions and objections. Alford suggested that Heft's death—just days prior to trial—put Alford in a position of having to proceed with Heft's deposition or delay the trial to get another expert. Alford also said that this was not "a scientific thing . . . moving dirt" and Heft had spent his whole life as a dirt excavator and his son had spent numerous years as one. Alford Ranches also said Kevin's testimony rebutted TGC's expert testimony that the land did not need to be remediated. Finally, regarding the pictures of TGC's alternative equipment, Alford claimed TGC could not legitimately claim surprise because the photographs came from its web site. Alford also claimed the photos were to

> "offset the fact that he was claiming that they had no equipment that could do this any other way other than the heaviest equipment that they had and there was . . . equipment that weighed less than half of what the equipment was that they used which would clearly be negligence, especially given the fact that their expert testified that this was an

12

environmentally sensitive area with sand that was prone to be rutted if you used really heavy equipment . . . and they chose to use the heavier equipment."

TGC responded that it was most concerned with the photo of the truck with tracks instead of tires. Regarding Alford claim that there was testimony about lighter equipment, TGC clarified that the testimony revealed TGC's client chose the equipment and it had used lighter equipment before but could not get the work done. TGC reiterated that Alford had not presented any evidence of a standard of care or of a breach of that standard.

The district court found that "the only explanation for the verdict was that the jury inferred that that act was a lack of reasonable care or the act of a . . . person not acting as a reasonable person." The court determined TGC's first claim of error failed. Regarding Heft's testimony, the district court held that Heft's expertise was a matter of skill and experience and that "he said he would've charged $1.00 per foot if he had an implement that would do it." "That's what apparently the jury based their finding on." The judge said it "appears that [Heft's] testimony was admissible based upon his experience, so I find that was not improper." Third, the court held that the rebuttal testimony was not improper and it did not appear the jury considered it. Regarding the photographs of equipment, the court held the evidence went to the issue of whether there was alternative equipment available. The court noted the "jury considered whether or not [TGC] should've waited until it was drier to go in." The court denied TGC's motion.

On appeal, TGC challenges the sufficiency of the evidence and the admission of evidence and testimony.

For the first time, TGC challenges the sufficiency of the evidence presented at trial. We can consider a challenge to the sufficiency of the evidence made for the first time on appeal. *State v. Farmer*, 285 Kan. 541, 545, 175 P.3d 221 (2008).

13

When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, an appellate court does not reweigh evidence or pass on the credibility of the witnesses. If the evidence, viewed in the light most favorable to the prevailing party, supports the verdict, the verdict will not be disturbed on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 407, 266 P.3d 516 (2011).

In a negligence action, the plaintiff carries the burden of proving the following four elements: (1) a duty owed to the plaintiff by the defendant, (2) a breach of that duty, (3) causation between the breach of the duty and injury to the plaintiff, and (4) damages suffered by the plaintiff. *Shirley v. Glass*, 297 Kan. 888, Syl. ¶ 4, 308 P.3d 1 (2013). "Thus, with no breach of duty, there is no fault or negligence issue for the district court to reach." *Kemp v. Hudgins*, No. 108,715, 2013 WL 6331604, at \*9 (Kan. App. 2013) (unpublished opinion), *rev. denied* 300 Kan. 1103 (2014).

Black's Law Dictionary defines "negligence" as "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation; any conduct that falls below the legal standard established to protect others against unreasonable risk of harm. . . . The term denotes culpable carelessness." Black's Law Dictionary 1133 (9th ed. 2009). Our Supreme Court has acknowledged that the word "negligence," "standing alone" refers to the "duty" and "breach" elements of a negligence claim. *Fiser v. Kansas Bd. of Healing Arts*, 281 Kan. 268, 272, 130 P.3d 555 (2006).

"Kansas law does not presume negligence, nor does it allow negligence to be established by conjecture, surmise, or speculation. Negligence must be proved by substantial competent evidence." *Yount v. Deibert*, 282 Kan. 619, 624, 147 P.3d 1065 (2006); see also *Siruta v. Siruta*, 301 Kan. 757, 767, 348 P.3d 549 (2015). In *Siruta*, our Supreme Court explained when negligence can be established through circumstantial evidence:

"It is well established that negligence may be proved through circumstantial evidence, however. [Citation omitted.] In order for circumstantial evidence to be sufficient to establish negligence, '"such evidence need not rise to that degree of certainty which will exclude any and every other reasonable conclusion'—instead, '[i]t suffices that such evidence affords a basis for a reasonable inference by the court or jury,"' even though 'some other inference equally reasonable might be drawn [from the evidence].' [Citations omitted.] Triers of fact may also 'draw upon their own experiences in determining causation.' [Citation omitted.]" *Siruta*, 301 Kan. at 767.

On appeal, TGC contends there is insufficient evidence that it was negligent when it surveyed Alford's land. We must determine whether the evidence viewed in the light most favorable to Alford supports the jury verdict. Each element will be addressed in turn.

*Duty*

Whether a duty exists is a question of law. *Siruta*, 301 Kan. at 767. Appellate courts have unlimited review of questions of law. *Thomas v. Board of Shawnee County Comm'rs*, 293 Kan. 208, 220-21, 262 P.3d 336 (2011)

TGC argues that Alford presented no evidence at trial that TGC owed a duty to Alford. In response, Alford contends that "TGC had a duty to conduct its seismic survey in a manor [*sic*] that did no damage or at least little damage a [*sic*] as possible to Alford's land." Alford also claims TGC had a duty to repair the land after the survey. But Alford does not provide a citation to the record on appeal or any caselaw in support of his claim of duty; instead Alford argues that TGC should be held strictly liable. An appellee is required to support statements "by references to the record in the same manner as required of the appellant under Rule 6.02." Supreme Court Rule 6.03(a)(3) (2015 Kan. Ct. R. Annot. 48); see also Supreme Court Rule 6.02(a)(4) (2015 Kan. Ct. R. Annot. 48)

15

("The facts included in the statement [of facts] must be keyed to the record on appeal by volume and page number. The court may presume that a factual statement made without a reference to volume and page number has no support in the record on appeal."). We may presume there is no support in the record for Alford's claim that it established TGC had a duty and TGC breached that duty. See *Kenyon v. Kansas Power & Light Co.*, 17 Kan. App. 2d 205, 207, 836 P.2d 1193 (1992).

An independent review of the record indicates there is evidence TGC owed Alford a duty. This case is unusual because normally when exploration occurs, there is a contract that explains the parties' duties. The permit TGC sent to Alford in December 2009 recited the duty that TGC would be held to if Alford had signed the permit: TGC's "operations will be conducted in accordance with standard industry practices and in a prudent and careful manner." However, Alford never signed and returned the permit, so TGC was not contractually bound by the permit. Nonetheless, the permit does establish that TGC recognized it owed some duty to surface rights land owners.

A search of Kansas caselaw suggests appellate courts have never addressed whether seismic surveyors owe a duty to the surface rights owner absent a contract. But our courts have stepped in and imposed liability on the lessee under an oil and gas lease when the use of the surface has been "overreached and becomes injurious to the lessors' agricultural pursuits" even when there is no express provision in the lease. See *Norton Farms, Inc. v. Anadarko Petroleum Corp.*, 32 Kan. App. 2d 899, Syl. ¶ 9, 91 P.3d 1239 (2004).

A search of other jurisdictions indicates some provide a statutory duty owed to surface land rights owners. See Mont. Code Ann. § 82-10-505 (2015) ("The oil and gas developer or operator is responsible for all damages to real or personal property resulting from the lack of ordinary care by the oil and gas developer or operator."); Okla. Stat. tit. 52, § 318.22(D)(4) (2013 Supp.) (Absent a written agreement, notice shall include the

16

following language: "Operator will conduct the proposed seismic exploration in a prudent manner and agrees to indemnify and hold you harmless from personal injury or property damage claims that may result from the operator's seismic exploration to the extent that such damage claims are not the result of your acts or omissions.").

Also, at least Texas has recognized a duty owed to the surface rights owner. *Ball v. Dillard*, 602 S.W.2d 521, 523 (Tex. 1980). But other Texas courts have found that the dominant estate owner—the mineral rights owner—is the party owing the surface rights owner a duty. See *H.B. Taylor v. Brigham Oil & Gas, L.P.*, No. 0700-0225-CV, 2002 WL 58423, at *1 (Tex. App. 2002) ("It is incumbent upon the surface owner to establish that the dominant estate owner failed to use reasonable care in pursuing its rights or that the rights could have been pursued through reasonable alternate means sufficient to achieve the goal desired but without the damage.").

However, the Restatement (Third) of Torts imposes a general duty to exercise reasonable care. "A person acts negligently if the person does not exercise reasonable care under all the circumstances." Restatement (Third) of Torts: Phys. & Emot. Harm § 3 (2010); see also see also Restatement (Second) of Torts § 302, Comment a (1965) ("In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act.").

Even if TGC was not contractually bound by the permit, it should be held to the general duty articulated in the Restatement (Third) of Torts. This means TGC owed Alford a general duty to exercise reasonable care under the circumstances. However, there is no evidence in the record to support Alford's claim that TGC had the duty to conduct its seismic testing in a manner that did no damage or at least as little damage as possible. Instead, TGC had to exercise the care a reasonable seismic surveying company would have used under the circumstances.

17

Assuming TGC had the duty to exercise the standard of care that a reasonably prudent seismic surveyor would have exercised in a similar situation, the next question is whether sufficient evidence supports the finding that TGC breached that duty.

Briefly, Alford argues TGC should be held strictly liable for the first time on appeal and is therefore subject to the general rule that legal theories not asserted at trial will not be considered on appeal. Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. R. Annot. 41) ("If the issue was not raised below, there must be an explanation why the issue is properly before the court."); see also *In re Care & Treatment of Miller*, 289 Kan. 218, 224-25, 210 P.3d 625 (2009); *Louisburg Building & Development Co. v. Albright*, 45 Kan. App. 2d 618, 627, 252 P.3d 597 (2011). Our Supreme Court recently reiterated that "Rule 6.02(a)(5) means what it says and is ignored at a litigant's own peril." *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015).

Alford's failure to argue an exception applies means he has abandoned this issue and we decline to consider it.

*Breach*

TGC next argues its actions did not lack reasonable care. Alford argues a reasonable person would have used a lighter truck and repaired the ruts. But again, Alford fails to cite to the record and therefore has failed to satisfy Supreme Court Rule 6.03(a)(3).

However, even if we consider the issue, the record as a whole indicates Alford presented no evidence of breach at trial. "Whether the duty has been breached is a question of fact." *Sall v. T's, Inc.*, 281 Kan. 1355, Syl. ¶ 2, 136 P.3d 471 (2006). We must

decide if there is evidence to support the jury's finding that TGC failed to act as a reasonably prudent person in a similar situation.

TGC highlights that it had a right to enter the property to perform the survey and argues there was no evidence the ground was wet or any other evidence that warranted delaying the survey. TGC suggests the evidence indicates it acted with reasonable care when performing the survey and therefore it was not negligent. TGC argues Alford's suggestion that it could have used alternative equipment was not supported by evidence and that any evidence supporting it was improperly admitted.

Alford attempted to establish that TGC acted unreasonably when it surveyed the land.

> "Generally, when plaintiffs are attempting to establish negligence based upon a departure from the reasonable standard of care in a particular profession, expert testimony is required to establish such a departure. *Moore v. Associated Material & Supply Co.*, 263 Kan. 226, 234-35, 948 P.2d 652 (1997); see, *e.g.*, *Bowman v. Doherty*, 235 Kan. 870, 879, 686 P.2d 112 (1984) ('[e]xpert testimony is generally required and may be used to prove the standard of care by which the professional actions of the attorney are measured and whether the attorney deviated from the appropriate standard')." *Davis v. Lafayette C. Greischar Living Trust*, No. 109,110, 2013 WL 5188441, at * __ (Kan. App. 2013) (unpublished opinion).

However, Alford pled this case as general negligence instead of professional negligence. Alford did not present expert testimony or lay testimony from another seismic surveying company to explain the general standard of care a seismic surveyor should have used. Instead, Alford presented evidence from a TGT employee and then relied on the testimony of TGC employees to establish the industry standard of care. The testimony revealed:  The industry standard vibrator truck was the Hemi-60; permit agents considered the weather and soil type when conducting a survey; the client dictated which

19

vibrator truck the company would use; a day and a half drying time for each half inch of precipitation was sufficient; and large ruts were normal after a survey

We must next determine whether there was sufficient evidence that TGC breached this duty. That is, did TGC act unreasonably in anyway or fail to do something a reasonable seismic surveying company would have done?

As the plaintiff, Alford carried the burden of establishing that TGC breached its duty. *Bi-State Dev. Co. v. Shafer, Kline & Warren, Inc.*, 26 Kan. App. 2d 515, 517, 990 P.2d 159 (1999). We must view the evidence in the light most favorable to Alford when determining whether sufficient evidence supports a finding of breach.

At trial, Alford suggested two unreasonable actions on the part of TGC: (1) "going out there when it was too wet" and (2) "not using a smaller vibrator truck." On appeal, Alford suggests TGC was unreasonable for failing to use a smaller truck and not repairing the ruts.

Regarding the claim that the land was too wet, the evidence revealed that Alford testified Burson had contacted him in March 2010 and Alford said it was too wet for the survey crew to come out, but—without reweighing credibility—the evidence unequivocally established that Burson last worked for TGC in late January and had died in February. Assuming Alford did tell Burson he did not want TGC to come out because the land was still wet, this conversation could not have happened in March because Burson had died.

The snow had melted by February 25, 2010, 16 days before the survey. There was precipitation of .39 inches on March 8, 2010, .01 inches on March 9, 2010, and .03 inches of precipitation on March 11, 2010. Rounding this precipitation up to a half inch means TGC needed to wait until March 10th to perform the survey. The receiver crew arrived on

20

Alford's land on four-wheel drive ATVs on the 10th, but the vibrator trucks did not arrive on the land until the 13th—well after the day and a half wait time. There was nothing in the weather reports to suggest TGC should not have performed the survey on March 13, 2010.

This evidence is insufficient to establish that TGC acted unreasonably by performing the survey on March 13 through 16, 2010, due to the wetness of the ground. It is not reasonable to assume the .04 inches of precipitation that fell on March 9 and 11, 2010, would have caused the ground to be too wet for the survey.

Alford also claimed that TGC should have used a smaller truck than the Hemi-60. The evidence revealed that smaller trucks existed, but TGT requested TGC use the Hemi-60. The Hemi-60 was the industry standard truck, and it provided the most advanced and deepest survey. Butler testified the ruts left on Alford's land were the regular ruts; and although not as helpful, Heft's deposition revealed the ruts on Alford's land were similar to those left on his land. Yohn testified he had accepted $5 per acre from TGC.

Also notable is the absence of evidence presented at trial. Alford presented no evidence that the smaller vibrator trucks had the same surveying capabilities or would have left smaller track. There is only evidence that other vibrator trucks existed, which is insufficient to create the inference that a reasonable seismic surveyor in these circumstances would have used a smaller vibrator truck.

In order to hold that TGC acted unreasonably by failing to use a lighter truck, we would have to find it would have been reasonable for TGC to disregard the industry standard vehicle and the requests of its client and use a vibrator truck that did not have as deep surveying capabilities. This does not seem to be a reasonable inference based on the evidence.

21

Alford argues it was unreasonable for TGC not to fix the ruts. But the evidence revealed TGC offered Alford Ranches $5 per acre in standard damages, but Alford refused to accept it. The evidence also revealed that TGC had formulas to assess damage greater than the normal $5 per acre and it would send a permit agent to inspect the land when notified by the surface rights owner. There is no evidence a reasonable seismic surveyor would have fixed the ruts, only that a reasonable seismic surveyor would have offered $5 per acre and then assessed possible greater damages when asked to by the surface rights owner.

Finally, Alford did not present any evidence to suggest that there was something a reasonable seismic surveyor would have done that TGC did not do. And there is no evidence that the ruts left on Alford's land were more severe than the ruts that would be left by a reasonably prudent seismic surveyor.

"'There is nothing in the laws, the constitution or in *magna charta*, or in the great principle of jury trials, which can justify, or for a moment tolerate, a verdict without evidence or contrary to all evidence. The law will permit no such verdict. A jury has no power to render it, and no court should allow it to stand. You cannot predicate discretion of such a case. It is a case where there is none.'" *Backus v. Clark*, 1 Kan. *287, 295 (1863).

Viewing the evidence in the light most favorable to Alford, the record indicates TGC acted reasonably when it performed the survey of Alford's land.

*Conclusion*

There was insufficient evidence that TGC acted unreasonably. We reverse the judgement and the award of damages.

Reversed.

22